ORIGINAL

2019 MAR 25  AM 9:06

DEPUTY CLERK ___

1  Robert A. Ball, California Bar No. 70061
   John M. Donnelly, California Bar No. 156965
2  LAW OFFICES OF ROBERT A. BALL
   225 Broadway, Suite 2220
3  San Diego, California 92101
   Telephone: (619) 234-3913; Facsimile: (619) 234-4055
4
5  Benjamin H. Davidson, II, State Bar No. 05430590
   Mary Kathleen Davidson, State Bar No. 24070919
   McCLESKEY HARRIGER BRAZILL & GRAF LLP
6  5010 University Avenue, Suite 500
   Lubbock, Texas 79413
7  Telephone:  (806) 796-7306; Facsimile: (806) 796-7365

8  Attorneys for: Plaintiffs KAREN DI PIAZZA,
   Individually and as Mother to CORBIN JAEGER and as Personal
9  Representative of the Estate of CORBIN LEE JAEGER, Deceased

10                 **UNITED STATES DISTRICT COURT**

11          **NORTHERN DISTRICT OF TEXAS, LUBBOCK DIVISION**

12  KAREN DI PIAZZA, Individually and As          **PLAINTIFF'S ORIGINAL COMPLAINT**
    Mother to CORBIN JAEGER and As
13  Personal Representative of the Estate of      **5- 19 C V 0 0 6 0 - C**
    CORBIN LEE JAEGER, Deceased,
14
15                    Plaintiff,
16  v.
17  WEATHER GROUP TELEVISION, LLC
    dba THE WEATHER CHANNEL, a
18  Georgia limited liability company;
    WEATHER GROUP, LLC, a Delaware
19  limited liability company; THE WEATHER
    CHANNEL INTERACTIVE, LLC, a Georgia
20  limited liability company;
    ENTERTAINMENT STUDIOS, INC., a
21  corporation of unknown domicile; CF
    ENTERTAINMENT, INC. dba
22  ENTERTAINMENT STUDIOS, a California
    corporation; ENTERTAINMENT STUDIOS
23  NETWORKS, INC., a California
    corporation; ENTERTAINMENT STUDIOS
24  MEDIA, INC., a California corporation;
    ENTERTAINMENT STUDIOS MEDIA
25  HOLDINGS, INC., a Delaware corporation;
    NBCUNIVERSAL MEDIA, LLC, a
26  Delaware limited liability company; NBC
    UNIVERSAL, INC., a Delaware
27  corporation; BAIN CAPITAL INVESTORS,
    LLC, a Delaware limited liability company;
28  THE BLACKSTONE GROUP, INC., a

LAW OFFICES OF
ROBERT A. BALL
225 Broadway, Suite 2200
San Diego, CA 92101-5013
Tel #(619) 234-3913

1

PLAINTIFF'S ORIGINAL COMPLAINT

1    Delaware corporation; TV HOLDINGS 1,
     LLC, a Delaware limited liability company;
2    TV HOLDINGS 2, LLC, a Delaware limited
     liability company; TV SPINCO LLC, a
3    Delaware limited liability company;
     SHEENA BITTLE as Personal
4    Representative of the Estate of KELLEY
     GENE WILLIAMSON; KEITH DANIELS as
5    Personal Representative of the Estate of
     RANDALL D. YARNALL,
6
                    Defendants.
7

8

9                    **PLAINTIFF'S ORIGINAL COMPLAINT**

10          TO THE HONORABLE UNITED STATES DISTRICT COURT:

11          COMES NOW KAREN DI PIAZZA, Individually and as Mother to CORBIN

12   JAEGER and as Personal Representative of the Estate of CORBIN LEE JAEGER,

13   Deceased ("Plaintiff"), complaining of WEATHER GROUP TELEVISION, LLC dba THE

14   WEATHER CHANNEL ("Weather Channel"); WEATHER GROUP, LLC ("Weather

15   Group"); THE WEATHER CHANNEL INTERACTIVE, LLC ("Interactive LLC");

16   ENTERTAINMENT STUDIOS, INC. ("Studios"); CF ENTERTAINMENT, INC. dba

17   ENTERTAINMENT STUDIOS ("CF"); ENTERTAINMENT STUDIOS NETWORKS, INC.

18   ("Networks"); ENTERTAINMENT STUDIOS MEDIA, INC. ("Media"); ENTERTAINMENT

19   STUDIOS MEDIA HOLDINGS, INC. ("Media Holdings"); NBCUNIVERSAL MEDIA, LLC

20   ("NBC LLC"); NBC UNIVERSAL, INC. ("NBC Inc.") BAIN CAPITAL INVESTORS, LLC

21   ("Bain"); THE BLACKSTONE GROUP, INC. ("Blackstone"); TV HOLDINGS 1, LLC

22   ("TV1"); TV HOLDINGS 2, LLC ("TV2"); TV SPINCO LLC ("Spinco") (Weather Channel,

23   Weather Group, Interactive LLC, Studios, CF, Networks, Media, Media Holdings, NBC

24   LLC, NBC Inc., Bain, Blackstone, TV1, TV2, and Spinco will hereafter be collectively

25   referred to as "TWC"); SHEENA BITTLE as Personal Representative of the Estate of

26   KELLEY GENE WILLIAMSON ("ESTATE OF WILLIAMSON"); KEITH DANIELS as

27   Personal Representative of the Estate of RANDALL D. YARNALL ("ESTATE OF

28   YARNALL") (all named Defendants above shall hereafter be collectively referred to as

2

LAW OFFICES OF
ROBERT A. BALL
223 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5017
TELEPHONE: (619) 234-5023

PLAINTIFF'S ORIGINAL COMPLAINT

1    "TWC Defendants"), with this Original Complaint alleges as follows:

2                                       I.

3                    NATURE AND PURPOSE OF THE ACTION

4         1.      This action is brought by the heir and Estate of CORBIN LEE JAEGER

5    (DOB-6/11/91) ("JAEGER") who was killed in a horrific two-vehicle collision outside the

6    town of Spur, Texas on March 28, 2017. Corbin Lee Jaeger was killed when a Chevrolet

7    Suburban SUV, Missouri License Plate Number 7SY297 ("Suburban"), driven by Randall

8    Yarnall ("Yarnall") and occupied by Kelley Gene Williamson ("Williamson") ran a stop

9    sign at seventy (70) miles per hour while racing towards a tornado to film that tornado on

10   behalf of TWC and collided with Corbin Lee Jaeger's vehicle, a 2012 Jeep Patriot

11   ("Jeep"), while the Jeep had the right of way on westbound FM2794. The accident

12   occurred approximately 55 miles southeast of Lubbock and 5 miles west of the town of

13   Spur, in Dickens County, Texas, at the intersection of FM 2794 and County Road 419,

14   the latter also known as Farm to Market Road 1081 ("FM 1081") (all collectively, the

15   "Subject Accident").

16        2.      Yarnall and Williamson, who also died in the collision, were in the course

17   and scope of their employment as storm chasers and television personalities with TWC

18   when their Suburban ran the stop sign on northbound FM 1081. Plaintiff alleges that the

19   Suburban, which was filled with broadcasting, radar and other storm chasing equipment,

20   was being operated by and for the benefit of TWC as a mobile broadcasting studio and

21   to film severe weather and to collect film footage for the TWC show "STORM

22   WRANGLERS, SEASON 2," which television show starred Williamson and Yarnall as

23   storm chasers, inclusive of chasing tornados across the United States, when it collided

24   with the Jeep being driven by JAEGER. Furthermore, Yarnall and Williamson had a

25   history of reckless driving when storm chasing and when filming TWC's television

26   programming, which was well known among other storm chasers and TWC.  TWC was

27   aware of this history because it: (1) had been warned by other storm chasers on several

28   occasions before the Subject Accident that Yarnall and Williamson's driving put others at

LAW OFFICES OF
ROBERT A. BALL
225 Broadway, Suite 2200
San Diego, CA 92101-5019
Telephone: 619-234-3333

3

PLAINTIFF'S ORIGINAL COMPLAINT

1  risk; and (2) had witnessed the pair's dangerous driving during live video feeds of their

2  storm chasing, which was broadcast to TWC's studio and in the editing of its television

3  program, STORM WRANGLERS. However, despite this knowledge of the risk posed by

4  their employees/agents, TWC continued to allow Yarnall and Williamson to work as on-

5  air storm chasers and to record footage of "the chase" and of storms to be used in the

6  "STORM WRANGLERS" television program, which ultimately led to Corbin Jaeger's

7  tragic and completely avoidable demise.

8     3.     Plaintiff brings these wrongful death and survivor claims under Texas Civil

9  Practice & Remedies Code sections 71.002 and 71.021 to recover damages for the

10  death of JAEGER, which were directly and proximately caused by the acts and

11  omissions of Defendants.

12                                   II.

13                    JURISDICTION AND VENUE

14     4.     This court has original jurisdiction over this action pursuant to 28 U.S.C. §

15  1332 in that the controversy exceeds the sum or value of $75,000, exclusive of interest

16  and costs, and is between citizens of different States.

17     5.     Venue is appropriate in the United States District Court; Northern District of

18  Texas, Lubbock Division, since the town of Spur, in Dickens County, Texas was the

19  location of the Subject Accident that is the basis of the causes of action set forth herein.

20                                   III.

21                              PARTIES

22     6.     Plaintiff KAREN DI PIAZZA ("Plaintiff") resides in Glendale, Arizona and is

23  the mother of the decedent, Corbin Lee Jaeger, who was also a resident of and

24  domiciled in the state of Arizona at the time of his death. Plaintiff is also the Personal

25  Representative of the Estate of CORBIN LEE JAEGER.   The Estate of Corbin Lee

26  Jaeger is being administered in the Superior Court of Arizona, County of Maricopa, the

27  case titled *In the Matter of the Estate of Corbin Lee Jaeger, Deceased*, Case No. PB

28  2018-001588.

LAW OFFICES OF
ROBERT A. BALL
225 Broadway St, Ste 2200
San Diego, CA 92101-5014
Telephone: 619-274-3403

4

PLAINTIFF'S ORIGINAL COMPLAINT

7.    Defendant WEATHER GROUP TELEVISION, LLC dba THE WEATHER CHANNEL, is a Georgia limited liability company ("Weather Channel"). Plaintiff is informed and believes and thereon alleges that on or about March 7, 2016, The Weather Channel, LLC, a Georgia limited liability company, changed its name to Weather Group Television, LLC and at all times mentioned herein was doing business as The Weather Channel.   Service of Process may be had on the Weather Channel by service of its registered agent, REGISTERED AGENT SOLUTIONS, INC. at 900 Old Roswell Lake Pkwy, Suite 310, Roswell, GA 30076. Plaintiff is informed and believes, and thereon alleges, that Williamson and Yarnall were the employees and/or agents of the Weather Channel and were acting within the course and scope of that employment and/or agency at all times alleged herein.

8.    Defendant WEATHER GROUP, LLC, is a Delaware limited liability company ("Weather Group").   Service of Process may be had on Weather Group by service of its registered agent, REGISTERED AGENT SOLUTIONS, INC. at 9 E. Loockerman Street, Suite 311, Dover, DE 19901; 900 Old Roswell Lake Pkwy, Suite 310, Roswell, GA 30076.  Plaintiff is informed and believes, and thereon alleges, that Williamson and Yarnall were the employees and/or agents of Weather Group and were acting within the course and scope of that employment and/or agency at all times alleged herein.

9.    Defendant THE WEATHER CHANNEL INTERACTIVE, LLC, is a Georgia limited liability company ("Interactive LLC"). Service of process may be had on Interactive LLC by service of its registered agent, REGISTERED AGENT SOLUTIONS, INC. at 900 Old Roswell Lake Pkwy, Suite 310, Roswell, GA 30076. Plaintiff is informed and believes, and thereon alleges, that Williamson and Yarnall were the employees and/or agents of Interactive LLC and were acting within the course and scope of that employment and/or agency at all times alleged herein.

10.   Defendant ENTERTAINMENT STUDIOS, INC., is a corporation of unknown domicile ("Studios"). Service of Process may be had on Studios by service of

LAW OFFICES OF
ROBERT A. BALL

1  its General Counsel, MARK DEVITRE at 1925 Century Park East, Suite 10000, Los

2  Angeles, CA 90067.

3      11.    Defendant CF ENTERTAINMENT, INC. dba ENTERTAINMENT STUDIOS,

4  is a California corporation ("CF"). Service of process may be had on CF by service of its

5  registered agent, REGISTERED AGENT SOLUTIONS, INC. at 1220 S St., Suite 150,

6  Sacramento, CA 95811.

7      12.    Defendant ENTERTAINMENT STUDIOS NETWORKS, INC., is a California

8  corporation ("Networks"). Service of process may be had on Networks by service of its

9  registered agent, REGISTERED AGENT SOLUTIONS, INC. at 1220 S St., Suite 150,

10  Sacramento, CA 95811.

11      13.    Defendant ENTERTAINMENT STUDIOS MEDIA, INC., is a California

12  corporation ("Media"). Service of process may be had on Media by service of its

13  registered agent, REGISTERED AGENT SOLUTIONS, INC. at 1220 S St., Suite 150,

14  Sacramento, CA 95811.

15      14.    Defendant ENTERTAINMENT STUDIOS MEDIA HOLDINGS, INC., is a

16  Delaware corporation ("Media Holdings"). Service of process may be had on Media

17  Holdings by service of its registered agent, REGISTERED AGENT SOLUTIONS, INC. at

18  9 E. Loockerman Street, Suite 311, Dover, DE 19901.

19      15.    Defendant NBCUNIVERSAL MEDIA, LLC, is a Delaware limited liability

20  company ("NBC LLC"). Service of process may be had on NBC LLC by service of its

21  registered agent, ENTERPRISE CORPORATE SERVICES LLC at 1201 N. Market

22  Street, Suite 1000, Wilmington, DE 19801.

23      16.    Defendant NBC UNIVERSAL, INC., is a Delaware corporation ("NBC Inc.").

24  Service of process may be had on NBC Inc. by service of its General Counsel at

25  NBCUniversal, 30 Rockefeller Plaza, New York, NY 10112, and by service of its

26  registered agent, C T CORPORATION SYSTEM at 111 Eighth Ave., 13th Floor, New

27  York, NY 10011.

28      17.    Defendant BAIN CAPITAL INVESTORS, LLC, is a Delaware corporation

1  ("Bain"). Service of process may be had on Bain by service of its registered agent,

2  MAPLES FIDUCIARY SERVICES (DELAWARE) INC. at 4001 Kennett Pike, Suite 302,

3  Wilmington, DE 19807.

4      18.   Defendant THE BLACKSTONE GROUP, INC. is a Delaware corporation

5  ("Blackstone"). Service of process may be had on Blackstone by service of its registered

6  agent, THE CORPORATION TRUST COMPANY at Corporation Trust Center 1209

7  Orange St., Wilmington, DE 19801.

8      19.   Defendant TV HOLDINGS 1, LLC is a Delaware limited liability company

9  ("TV1"). Service of process may be had on TV1 by service of its registered agent,

10  REGISTERED AGENT SOLUTIONS, INC. at 9 E. Loockerman Street, Suite 311, Dover,

11  DE 19901.

12      20.   Defendant TV HOLDINGS 2, LLC is a Delaware limited liability company

13  ("TV2"). Service of process may be had on TV2 by service of its registered agent,

14  REGISTERED AGENT SOLUTIONS, INC. at 9 E. Loockerman Street, Suite 311, Dover,

15  DE 19901.

16      21.   Defendant TV SPINCO LLC is a Delaware limited liability company

17  ("Spinco"). Service of process may be had on Spinco by service of its registered agent,

18  REGISTERED AGENT SOLUTIONS, INC. at 9 E. Loockerman Street, Suite 311, Dover,

19  DE 19901.

20      22.   Service of Process may be had on Defendant SHEENA BITTLE, as

21  Personal Representative of the Estate of KELLEY GENE WILLIAMSON ("ESTATE OF

22  WILLIAMSON") by service on Defendant SHEENA BITTLE at 15223 Farm Road 1010,

23  Exeter, Missouri 65647. The ESTATE OF WILLIAMSON is being administered in the

24  Barry County Circuit Court, state of Missouri, entitled *In re the Estate of Kelly Gene*

25  *Williamson*, Case No. 17BR-PR00069.

26      23.   Service of Process may be had on Defendant KEITH DANIELS, as

27  Personal Representative of the Estate of RANDALL D. YARNALL ("ESTATE OF

28  YARNALL") by service on Defendant KEITH DANIELS at 102 West Street, Suite 5,

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5014
TELEPHONE AT (619) 234-5453

7

PLAINTIFF'S ORIGINAL COMPLAINT

1   Cassville, Missouri 65625, 417-847-0541. The ESTATE OF YARNALL is being

2   administered in the Barry County Circuit Court, state of Missouri, entitled *In re the Estate*

3   *of Randall D. Yarnall, Deceased*, Case No. 18BR-PR00052.

4          24.    Plaintiff is informed and believes and thereon alleges that at all times

5   herein mentioned, one or more and/or each of the TWC Defendants named herein, was

6   and now is the principal, agent, servant, employee, assignee, joint venturers,

7   predecessor-in-interest, successor-in-interest, aider and abettor, and/or co-conspirator of

8   each TWC Defendant, and in doing the things hereinafter alleged, were acting in the

9   course and scope of their authority as principals, agents, servants, employees,

10  assignees, joint venturers, predecessors-in-interest, successors-in-interest, and/or co-

11  conspirators and in the furtherance of such relationships, and with the full knowledge,

12  acquiescence, authorization, permission and consent of their Co-defendants, as

13  principals, and at their direction, instance and request.   TWC Defendants shared a

14  community of interest with each and one another and were intricately involved in the

15  principal enterprises of storm chasing, filming extreme weather conditions and in reality

16  television programming through the national broadcasting of their collective body of work

17  for which TWC Defendants received huge benefits and compensation through branding,

18  good will, advertisements and the airing of commercials.   Plaintiff is informed and

19  believes that TWC programming is received and viewed in approximately 80 million

20  households in the United States and TWC broadcasts approximately 90 hours of live

21  content weekly (*See*, Nielsen's June 2018 Universe Estimate).   Plaintiff is further

22  informed and believes and thereon alleges that each such TWC Defendant committed,

23  participated in, partnered, approved, consented to, ratified, authorized, directed, or

24  performed the acts, omissions, transactions and occurrences which constitute the

25  subject matter of this action.

26         25.    Plaintiff is informed, believes, and based thereon alleges that at all times

27  herein mentioned, each of the TWC Defendants, was the alter ego of each other TWC

28  Defendant.   There is such a unity of interest and control between and among the TWC

LAW OFFICES OF
ROBERT A. BALL
223 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5014
TELEPHONE: 619-234-3455

8

PLAINTIFF'S ORIGINAL COMPLAINT

1   Defendants, and each other, that their separate identities have ceased to exist, or never

2   did exist.  To treat each entity Defendant as separate entities would perpetuate a fraud

3   or result in gross injustice.

4                                              IV.

5                                    CHOICE OF LAW

6       26.   Plaintiff alleges a conflict exists between the substantive law of Texas and

7   Arizona, Plaintiff's domicile, with respect to the following germane issues: (1)

8   comparative fault; (2) Plaintiff's right to recover exemplary damages under **COUNT TWO**

9   alleged herein; and (3) the amount of exemplary damages potentially available to

10  Plaintiff under **COUNT I, COUNT II** and **COUNT III** alleged herein. Plaintiff requests the

11  Court apply Arizona law as to these issues as opposed to Texas law to fully compensate

12  Plaintiff (*see, Sulak v. American Eurocopter Corp.,* 901 F.Supp.2d 834 (N.D. Texas

13  2012). As to comparative fault, Plaintiff requests the Court apply Ariz. Rev. Stat. § 12-

14  2505 (in conflict with Tex. Civ. Prac. & Rem. Code Ann. § 33.001). As to Plaintiff's right

15  to recover exemplary damages under **COUNT II** for the wrongful death of her adult son,

16  JAEGER, Plaintiff requests the Court apply Ariz. Rev. Stat. § 12-613 [*see also, Quinonez*

17  *v. Anderson,* 144 Ariz. 193, 696 P.2d 1342 (Ariz. Ct. App. 1984)] [in conflict with Tex.

18  Const. art. 16, § 26; *General Chemical Corp. v. De La Lastra,* 852 S.W.2d 916, 923

19  (Tex. 1993)]. As to the amount of exemplary damages potentially available to Plaintiff

20  under **COUNT I, COUNT II** and **COUNT III,** Plaintiff requests the Court apply Arizona

21  substantive law, which does not recognize a fixed standard for the amount of punitive

22  damages that may be assessed (in conflict with Tex. Civ. Prac. & Rem. Code Ann. §

23  41.008).

24                                              V.

25                         FACTS PARTICULAR TO PLAINTIFF'S CLAIMS

26  *a.*     ***Live stream video footage leading up to the collision.***

27       27.   Williamson and Yarnall were well-known storm chasers for TWC and stars

28  of the TWC show "STORM WRANGLERS". According to Williamson's Facebook profile,

9

1  Williamson started working at TWC on February 26, 2016, listing his occupation as

2  "Storm Chaser at The Weather Channel, covering all weather events via Live Stream as

3  it is happening." Plaintiff is informed and believes and thereon alleges that Yarnall

4  became Williamson's driving partner on April 9, 2016. Plaintiff is further informed and

5  believes and thereon alleges that on or about the summer of 2016, Williamson and

6  Yarnall were approached by TWC to star in a new television show ultimately named

7  "STORM WRANGLERS" in which Williamson and Yarnall, among other job duties, would

8  operate the Suburban to record video footage to be used by TWC employees, to wit,

9  video editors, producers and directors of TWC, to produce the television show "STORM

10 WRANGLERS" for national broadcast. TWC directly financially benefited from the

11 broadcast of "Storm Wranglers" through the sale of advertising and through promotion of

12 TWC itself. TWC's concept of the new show, modeled after David Chun's work on The

13 Ultimate-Fighter (mixed martial arts cage fighting) a Fox Sports Network sporting

14 television broadcast, was described by TWC's own employee, Mina Valizadeh, Direction

15 and Motion Designer, who was responsible for concept development, storyboarding,

16 design and animation of the TWC Storm Wrangler show package, as follows:  "Storm

17 Wranglers is a long form show produced by the Weather Channel which presents the

18 adventures of two Storm chasers from Texas: Kelly Williamson and Randy Arnold (sic).

19 The concept is introducing the storm wranglers as two heroes when they start the

20 adventure of chasing a storm.  The combination of footage and high contrast illustrations

21 are the general look and direction of the show.  The quick cuts between illustrative

22 animation and real footage capture the heroic and urgent feeling of the show."  Further,

23 Ms. Valizadeh states: "The concept is showing Kelley as the hero.  The combination of

24 footage and cutting into moving high contrast illustration of him and his environment will

25 be the general look and direction.  The cuts and quick motion bring a sense of thrill for

26 the adventure he will be going through.   Here is the inspiration link:

27 http://davidychun.com/The -Ultimate Fighter."   TWC's concept of presenting storm

28 chasing as an adventurous, thrilling sporting event and to make its two stars "heroes"

LAW OFFICES OF
ROBERT A. BALL

1    resulted in the violent death of young Corbin Lee Jaeger.   TWC Defendants were

2    operating TWC's mobile broadcasting studio (the Suburban) at approximately 70 miles

3    per hour racing northbound on FM 1081 to film a tornado when it ran the stop sign at that

4    speed at the intersection of FM 1081 and FM 2794 and struck the Jeep being operated

5    by Corbin Lee Jaeger, killing him.   Corbin Lee Jaeger was lawfully driving westbound on

6    FM2794 and away from that tornado.   Corbin Lee Jaeger was pronounced dead at the

7    scene by first responders and the Dickens County Coroner.

8          28.      Williamson and Yarnall were working in these capacities at the time of the

9    collision.  More specifically, Williamson and Yarnall were filming severe weather and live-

10   streaming the footage to Williamson's Facebook account and YouTube channel, as well

11   as to TWC's Facebook account, at the moment the two vehicles collided when the

12   Suburban driven by Yarnall ran the stop sign for its path of travel on Northbound FM

13   1081. The video Williamson live-streamed to his YouTube channel, "03-28-17 Tracking

14   Storms in West Texas" ("Video"), contains this footage.   The duration of the Video is 2

15   hours, 28 minutes, and 21 seconds ("2:28:21"), and it showcases Williamson and

16   Yarnall's travels throughout Texas that day. Due to lag between the audio and video, the

17   Video freezes at 2:25:49, at the moment the Defendants approached the stop sign,

18   immediately prior to the collision, at approximately 70 miles per hour. Defendants failed

19   to stop at that stop sign causing the collision and killing Corbin Lee Jaeger. The failure to

20   stop at this stop sign was Defendants' fourth such traffic violation that day.

21         29.      Throughout the Video, the two can be heard speaking to their employers at

22   TWC. At 2:13:30, Williamson tells the audience his stream is being shown on TWC's

23   Facebook live.   At 2:17:00, Mr. Scott Thompson, Director of Newsgathering for TWC,

24   calls Williamson and speaks to him for over a minute.  At 2:21:02, a woman's voice says,

25   "Hey Kelley, they still have you up on The Weather Channel full screen."   At 2:21:16,

26   Defendants' radar spotter, Barry Gray, says, "Kelley, you're on The Weather Channel full

27   screen."   At 2:21:58, a contact listed in Williamson's phone as "TWC The Weather

28   Cha…" calls him; the conversation lasts until 2:25:19.   Williamson was streaming the

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3453

11

PLAINTIFF'S ORIGINAL COMPLAINT

1    day's footage to TWC and had been in contact with TWC contemporaneously with the

2    Subject Accident.

3         30.    The Video also showcases four other instances of Williamson and Yarnall

4    running stop signs, besides the one that led to the Subject Accident, at 1:05:10, 1:08:15,

5    2:03:27, and 2:06:08.   The running a stop sign incident at 2:03:27 occurs at the same

6    intersection where the Subject Accident occurred as Williamson and Yarnall travel

7    southbound on FM 1081.   At 2:25:49, they approach the intersection of the Subject

8    Accident for the last time, traveling northbound on FM 1081. Prior to that stop sign, four

9    signs indicate the approach of a stop-controlled intersection.   The first warning is a

10   "Highway Intersection Ahead" sign.   After this, a "JCT 2794 Farm Road" sign indicates

11   the approaching junction with FM 2794.   After this, there is a stop sign warning sign.

12   After this, a sign indicates that the city of Spur is to the right, and White River Lake is to

13   the left, implying that these locations are accessible via FM 2794.   Finally, there is the

14   stop sign, itself.   The Video ends abruptly just before the collision, as the Suburban

15   travels full-speed towards the stop sign.   The warning signs, as well as the stop sign,

16   itself, are all clearly visible and unobstructed through the lens of the video equipment

17   being used and deployed by the TWC Defendants.   At this time, Defendants were

18   attempting to track down and film tornadoes in the region, and at the time of the Subject

19   Accident it was raining.   It is believed their speed at the time of driving through the stop

20   sign and at impact with the Jeep was approximately 70 miles per hour. Notably, no one

21   from TWC mentions or refers to the pair's blatant and repeated traffic violations during

22   the Video.

23   **b.    The Suburban's windshield was dangerously obstructed.**

24        31.    While the stop sign before the intersection of the Subject Accident was

25   unobstructed, the windshield of the Suburban operated by Defendants was obstructed.

26   Defendants had an array of expensive storm tracking and broadcast equipment, which

27   Plaintiff is informed and believes and thereon alleges, was paid for and installed by

28   TWC. This equipment dangerously limited Defendants' field of vision. Photos and video

12

1  that Yarnall and Williamson uploaded to their respective social media accounts

2  showcase the poor visibility they had from their positions in the Suburban. In a

3  December 29, 2016 interview on the podcast "Storm Front Freaks," Williamson stated, "If

4  anyone's ever seen [the Suburban], they wonder how I get in it. I've got a pretty good-

5  sized computer sitting here in front of me and one camera up in the windshield and then

6  I've got another console here that I run a camera that's actually up on top of my vehicle.

7  Then I've got up on the dash a live view that I actually stream back to TWC with. It's

8  kind of like crawling into a cockpit. There's not a lot of room." A copy of a photograph of

9  the inside of the Suburban from Williamson's vantage point (the front passenger's seat)

10 is attached hereto as **Exhibit "1."** In another live-stream broadcast uploaded to his

11 YouTube channel two days before the subject accident titled "03-26-17 Tracking Storms

12 in Okla and Texas", Williamson actually states at mark 13:09 on the stream, while

13 speaking live with TWC, "A lot of times, you can see more in your camera lens than you

14 can actually by eye, so I've actually got a screen in front of me that I pretty much watch

15 and a lot of times I can see more on it than by looking out the windows."

16      32.     This equipment also dangerously obstructed the view of the Suburban's

17 driver, Yarnall. A photograph depicting the driver's perspective from inside the Suburban

18 taken about twenty minutes before the Subject Accident occurred shows Yarnall's

19 cellphone mounted on the bottom left portion of the windshield, with a radar application

20 open on the screen, showcasing the region's weather patterns. (**Exhibit "2."**) Thus,

21 Yarnall, the designated driver, had access to, used and deployed, while driving, TWC

22 equipment that distracted Yarnall in the operation of the Suburban and obstructed his

23 view of the roadway.

24 **c.    Williamson and Yarnall were habitually reckless and dangerous.**

25      33.     The reckless and irresponsible driving employed by Williamson and Yarnall

26 and TWC on the day of the Subject Accident was, unfortunately, not an aberration. To

27 the contrary, it was the culmination of a long and well-documented history of dangerous

28 behavior behind the wheel. In other videos on Williamson's YouTube channel, which

13

LAW OFFICES OF ROBERT A. BALL

1    showcase entire days of storm chasing, Williamson and Yarnall show time and again

2    their disregard of basic traffic safety laws. In just fourteen (14) of these videos (a mere

3    fraction of roughly 223 posted videos), the pair runs approximately eighty (80) stop

4    signs, four (4) red lights, and one (1) out-of-service traffic light. Williamson, who directed

5    Yarnall's driving while storm chasing, can often be heard saying, "Clear," informing

6    Yarnall that he (Yarnall) has the go-ahead to ignore the stop signal.   Further, they

7    frequently drove at high speeds in severe weather conditions and made dangerous,

8    illegal passes of other cars, even with hail on the ground.  Williamson can sometimes be

9    heard instructing Yarnall to make these maneuvers, as one example: "If you can, get

10   around them."  There are also numerous instances of the pair driving on the wrong side

11   of the road, both by accident and by design.   Williamson also frequently encouraged

12   Yarnall to drive more aggressively in order to get into better positions from which to film

13   storms, especially when they were out of position or in the wrong town.  He often made

14   comments like: "Go, go, go Randy.  This is something you don't get much.  Keep going";

15   "That way, straight ahead, just lay it on"; "Keep going, keep going Randy"; "Get on it, get

16   on it, come on, get it up there.  Take it out of four-wheel drive"; "Fifty – not going fifty.

17   Crank it"; "Just go as hard as you can."  "Get back in it if you can."  "We're getting out of

18   it."  "See if you can get in this one"; and "Gonna need to get up here as quick as we can.

19   Just do what you can do to get us up there."  Williamson even joked about Yarnall's

20   aggressive driving: "We're gonna be testing Randy's driving skills today"; "Yeah, I got

21   Randy driving.  He's my nitrous tanks"; and "I could say you drove your ass off."

22         34.     Yarnall also made light of his own driving behavior. On October 8, 2016,

23   Williamson posted a photo to his Facebook account of the Suburban, with TWC's logo

24   on the rear passenger door, getting its transmission replaced, with the following caption:

25   "'Just about has a new transmission' – at Jon Murdock Chevrolet Cadillac Mitsubishi."

26   An individual commented on the photo, implying that Yarnall's aggressive driving was

27   the cause for the need of a new transmission: "Randy's hot rodding?"  Yarnall replied to

28   the post "Go go go lol [sic]."  On October 26, 2016, Yarnall made his Facebook profile

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5014
TELEPHONE (619) 234-3423

picture a short, repeating video of a tornado.  The footage appears to have been shot from the driver's side window while the vehicle was in motion, as the driver's side mirror was closely visible in the video and one can see trailing traffic in that mirror.   An individual posted a comment asking, "What is the location?"  Yarnall replied, "That was the Dodge city one in may [sic].   Cell phone out the window."  Another individual commented on the same video: 'I remember thinking at the time "please lord, two hands on the wheel..."'  In response, Yarnall replied, "Lol."  It appears that Yarnall filmed the tornado with his cell phone being held and operated by his left hand out the driver's side window of the vehicle he was driving and then bragged about it on social media.  Further, in one of Williamson's storm chasing videos "02-28-17 Tracking Severe Storms in Missouri 2", taken one month prior to the subject accident, Williamson mentioned that TWC was following their live stream: "They're listening.  Scott [Thompson]'s listening."  Yarnall responded, "If you're listening, hang on.  I'm gonna have to do some offensive driving."   Roughly eight minutes later at 31:56, Yarnall and Williamson run a stop sign while turning left at an intersection as it hails.

*d.*   ***TWC consistently monitored and directed Williamson and Yarnall.***

35.   In-studio representatives of TWC and the COMPANY monitored and worked very closely with Williamson and Yarnall as Williamson live-streamed so that the in-studio, on-camera anchors could showcase his live-streams and interview him when he captured particularly exciting footage.  In a video "03-24-17 Tracking Storms in NE Texas" (50:37 duration), just four (4) days prior to the fatal collision, Williamson and Yarnall were parked, filming rain and clouds, while trying to determine their plan of action.  At 32:45, Williamson received a text from TWC and Williamson says, "They said they're listening to you reading the radar, Randy.  Are you talking to yourself?   This thing's turned up too high. I think they can hear us think."  Yarnall had been muttering to himself under his breath while evaluating the storm's radar data, and someone at TWC texted Williamson to inform him that they could hear Yarnall doing so.  In another video from the same day, "03-24-17 Tracking Storms in NE Texas" (10:27:37 duration),

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE (619) 234-3433

PLAINTIFF'S ORIGINAL COMPLAINT

1    Williamson went live on TWC with TWC's employee, Chris Warren ("Warren") at 6:11:34.

2    Towards the end of their live session, Warren states, "Alright, storm tracker Kelley

3    Williamson.  You keep an eye on the sky, and we'll keep an eye on your camera, and we

4    will check back on you a little later."  Warren then stated on-air that TWC would continue

5    to watch Williamson's live-stream.  Such occurrences are commonplace throughout the

6    numerous videos posted by Williamson.

7        36.    These in-studio TWC representatives did more than monitor the pair's

8    footage; they instructed Williamson and Yarnall to perform certain actions.  For example,

9    in the video "03-15-17 Tracking Lake Effect Snow" (6:47:15 duration), the pair decided to

10   find a suitable location to pull over so that they could remove ice accumulated on the

11   equipment mounted to the vehicle's roof.  At 1:11:30, they pull into a car wash, and the

12   camera is directed at a wall as Williamson removes the ice.  Less than five minutes later

13   at 1:16:18, Yarnall informs Williamson that TWC notified him via Facebook that he

14   needed to move his camera to capture a better image than the wall in front of their

15   vehicle.  In response, Williamson promptly readjusted the camera to face outside of the

16   car wash to capture the snowy weather conditions. It was not unusual for Williamson and

17   Yarnall to receive such specific directives from TWC. In other videos, TWC informed

18   them of the days they would be working and the days they would have off, as well as the

19   locations to which they would be sent.

20       37.    In another video, "01-21-2017 Tracking Storms in Dixie Alley" (5:11:02

21   duration), TWC used the Suburban as a mobile broadcasting studio. In this footage shot

22   near Hattiesburg Mississippi, Williamson and Yarnall transport two local residents injured

23   by a tornado to a local hospital. In route, Williamson, Yarnall and TWC turn on the

24   Suburban's onboard cameras and conduct an interview of the tornado victims, which

25   was broadcast live nation-wide from the interior of the moving Suburban.

26   *e.*    ***TWC encouraged the pair's recklessness and set the stage for this tragedy.***

27       38.    TWC characterized and advertised Williamson and Yarnall's show

28   "STORM WRANGLERS" as a dangerous enterprise. The name "STORM WRANGLERS"

16

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5054
TELEPHONE: 619-234-1415

PLAINTIFF'S ORIGINAL COMPLAINT

1    itself connotes rushing into harm's way, riding and wrestling storms. The "logo" for the

2    "STORM WRANGLERS" television show depicts Williamson and Yarnall roping a

3    tornado.   Instead of using meteorologists experienced in the tracking of tornados,

4    however, TWC knowingly chose two chicken farmers and cattle ranchers from Missouri

5    without any emergency/first responder or meteorological training to star in their show.

6    TWC then instructed them to barrel into dangerous weather conditions to obtain footage,

7    needlessly endangering local residents fleeing impending catastrophe and trained first

8    responders.

9        39.   On September 29, 2016, TWC issued a press release: 'Network

10   Announces "Storm Wranglers" Two-Week Event.'   The announcement stated, 'The

11   Weather Channel will also [show] "Storm Wranglers," a special two-week event kicking

12   off Sunday, October 9 at 9 p.m. EST.   Storm Tracker Kelley Williamson and partner

13   Randy Yarnall go head-to-head with every storm imaginable including powerful

14   tornadoes and supercell thunderstorms.   The Missourian duo truly love tracking storms

15   in a down-home, authentic way.' It stated further, "[Williamson] has become the eyes and

16   ears on the ground for the network when viewers need help the most." The article quoted

17   Howard Sappington, identified as the Vice President of Programming for TWC, saying,

18   'Kelley in particular is such an interesting and passionate character, and we feel lucky to

19   have him as part of our family.   We believe both "Storm Wranglers" and "Weather Gone

20   Viral" will not only prove to be very exciting to audiences but deliver on our promise to

21   viewers to return to our weather roots.'   TWC released the first episode of "STORM

22   WRANGLERS" on October 2, 2016 and released the second episode on October 9,

23   2016. Underneath the announcement, TWC described a "recently launched community

24   platform, weloveweather.tv," which serves as a website for fans of TWC, operated by

25   TWC.

26       40.   On weloveweather.tv, a post by "The Weather Channel Staff" on

27   September 26, 2016 showcased an "Exclusive Preview of Storm Wranglers!" Part of this

28   promotion included an online question and answer session with Williamson, where he

17

LAW OFFICES OF
ROBERT A. BALL
225 Broadway, Suite 2200
San Diego, CA 92101-5074
Telephone 619-231-7415

PLAINTIFF'S ORIGINAL COMPLAINT

posted a short biography and answered questions.  On September 26, Williamson wrote, "In order to be a storm chaser you must: understand the dangers and know your vehicle and your limitations on muddy dirt roads."  He continued, "What makes me different from other storm trackers: when I go chasing I go with the objective of streaming a tornado to the public or The Weather Channel.  If I could not stream I would not go."  He continued, "I am not a meteorologist and I'm not an actor but I love chasing tornadoes enough that I think it overcomes my weaknesses."  In a question about his partner Yarnall, he wrote, "Randy has just been chasing with me since April and I have known him all my life we [sic] used to run around as kids on the back-dirt roads of Missouri.  We have had a trust that has grown between us and I think if I told him to drive into a lake he would."  On September 30, 2016, Williamson wrote, "The hardest part is the navigating of the roads. To be able to get where you want to be."  He described his education: "I am a self-taught storm chaser.  I've learned everything I know on the internet – like YouTube training videos and storm-related articles."  He continued, "I'm not a meteorologist.  I didn't go to school for that."  When asked if he ever got frustrated when he could not get to a storm's location fast enough, he stated, "Every time.  You just can't [get] there fast enough." When asked how he came to work for TWC, he stated, "Streaming my videos caught their attention.  I had a good quality stream and they started buying it so over time I ended up here!"  When asked about funding and equipment costs, Williamson wrote, "Luckily I've got The Weather Channel to help equipment, but before I had to sell my videos to afford anything.  It's about a week to get more equipment if you don't have backup."  He continued, "The main cost is fuel for us.  We get 3 tanks a day sometimes." On October 3, 2016, he wrote, "The Weather Channel purchases my fuel since I started working for them."  When asked what his favorite job was, he responded, "What I'm doing right now tracking storms for The Weather Channel man you can't beat that it's great."

41.    TWC also purchased insurance policies on Williamson and Yarnall, as indicated by Williamson in a live-streamed video taken less than two weeks before the

18

LAW OFFICES OF
ROBERT A. BALL
225 Broadway, Suite 2200
San Diego, CA 92101-5017
Telephone: 619-234-3455

PLAINTIFF'S ORIGINAL COMPLAINT

subject accident.   In "03-15-17 Tracking Lake Effect Snow" at 6:37:12, Williamson explains why TWC did not allow fans to ride along with him and Yarnall during their chases, stating, "Right now the insurance and that is just on me and Randy and cameramen and stuff like that and it's all through The Weather Channel, so right now there's some legal stuff that won't cover other people.  If a piece of hail hits you in the head, they don't want to get sued."  Notably, two days before the subject accident in the video "03-26-17 Tracking Storms in Okla and Texas", another storm chaser asked Yarnall at 1:53:41 if he and Williamson are "with The Weather Channel" or "just independent."  Yarnall replied, "We're with them.  We work for them."

**f.    TWC was aware the pair drove dangerously and the risk they posed to others.**

42.    Importantly, TWC was fully aware of and had been warned by third parties that their "STORM WRANGLERS" engaged in reckless driving before this tragedy.  In one instance, another storm chaser, who had also been featured on TWC on multiple occasions and knew Williamson and Yarnall personally, exchanged a series of text messages with Kathryn Prociv ("Prociv"), a producer of the television show "STORM WRANGLERS" and meteorologist for TWC, concerning the dangerous nature of the driving habits of the "STORM WRANGLERS." On December 4, 2016 (approximately four months before the Subject Accident), this storm chaser texted Prociv: *"As far as Storm Wranglers: I understand the need and fact for 'dumbing down' for the general public. But I'm gonna be honest here (and I hope you take no offense at what I am going to say please... the fact of re matter is that you have 2 very inexperienced, new and uneducated 'chasers' .... talk about liability.  See where I am going with this?.... I'm not gonna badmouth Kelly but I'm not gonna lie either."*

43.    On March 4, 2017 (24 days before the Subject Accident), after nationally airing a segment that showed Williamson traveling over 90 mph to try to reach a storm, Prociv wrote the same storm chaser: *"So great to hear from you. Ugh frustrating for you and us! I forwarded some notes from your message to my boss* Mike *Chesterfield.*

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5084
TELEPHONE 619-234-3413

PLAINTIFF'S ORIGINAL COMPLAINT

*Hopefully he gets back to me this upcoming week. I'm not sure if you happened to catch any of Kelley's movements, but he put himself in a VERY bad spot, live on air, so god forbid if anything happened we would have seen it happen live on air. NOT GOOD."* Mike Chesterfield was at the time of Corbin Lee Jaeger's death, and is currently, Director, Weather Presentation and an Executive Producer for and a managerial employee of TWC.

44.     Later that day (March 4, 2017), the storm chaser responded: *"Oh yeah, I saw it... I [message missing] "bad guy" but I'm going to be honest with you – it's only gonna get worse. You and I both know that you absolutely cannot put yourself in a position like that... storm movements being so fast leaving little time to react and losing situational awareness simply due to inexperience. Doing 90+mph to get to the position he was is just asking for bad stuff and showing or talking about it on his live stream. I just hope he truly understands the risks associated. The goal isn't to become part of the Weather story, it's to help tell the Weather story. I know Randy [another chaser] tried to teach him some of these things in the past and I even tried to educate him privately before you all singed him. But hey, we were all noobs at some point and learning... we just didn't have a national audience on us at that time. We are just hoping he doesn't get hurt or hurt anyone else. There is so much more I'd like to say but I don't want to get involved."*

45.     On March 29, 2017 (the day after the accident), Prociv and the same storm chaser exchanged more messages. Prociv wrote: *"Of course I know what you mean! I want to be here for you, I do, and I'm more comfortable talking here than on the phone where they could check my records if they really wanted to. I'm mainly concerned with how you're holding up. I don't blame you for calling off the chase. It wouldn't have been safe for you to chase today if your mind was consumed elsewhere."*

46.     The same day the storm chaser responded: *"Thank you. I'm doing okay. I mean you know that Kelley and I didn't have the relationship like Tim [storm chaser and engineer killed in 2013 El Reno tornado] and I. But everything I told him about driving*

LAW OFFICES OF
ROBERT A. BALL
223 Broadway, Suite 2200
San Diego, CA 92101-5014
Telephone (619) 234-3401

20

PLAINTIFF'S ORIGINAL COMPLAINT

1 *safer and not being so distracted... and then telling you that I was worried that he was*

2 *gonna kill someone or himself... those are the exact messages I shared with you. And*

3 *then it happens. So I am obviously in a way dark place right now. I know many of us*

4 *are. I guess that's what killin me. I tried to tell him over and over. And then when I saw*

5 *him yesterday near Paducah he pulls up and he was driving not Randy, I asked him why*

6 *he was driving and not doing the filming in a joking manner he just laughed. We talked*

7 *about the storms and the day and then said our goodbyes and good lucks... he drove*

8 *off. I remember thinking hope they are safe today.... And hope they have a good day. I*

9 *don't know. It's a rough day. I shut my stream off and went south right after we chatted*

10 *and man... that was stupid. It was bad."* Later, Prociv responded: *"Oh wow I didn't*

11 *realize you chatted with him yesterday before the storms started. I know you tried to*

12 *warn him and provide advice several times, so you did everything you could. You really*

13 *did. Please don't beat yourself up over it Lanny. You're all heart and were looking out*

14 *for everyone's safety. I'm glad you're headed home. Try and get some much needed*

15 *rest."*

16      47.    Additional messages exchanged between other chasers further confirm the

17 warnings given to high managerial agents of TWC regarding Williamson's and Yarnall's

18 dangerous driving habits. Furthermore, Plaintiff is informed and believes and thereon

19 alleges that at least one individual received a potentially disturbing request from TWC

20 immediately after the accident. This individual, another storm chaser, was one of the first

21 to arrive at the scene of the Subject Accident, before even emergency personnel. Upon

22 arrival, he immediately contacted TWC to notify them that one of their vehicles was

23 involved in the collision, which he easily deduced by virtue of the large TWC logo on the

24 Suburban. He also recognized Williamson on the side of the road as he was being

25 administered CPR. This witness immediately notified Jim Cantore, an extremely well

26 known, on-camera meteorologist and television personality for TWC. Shortly after doing

27 so, while this witness was speaking to a police investigator at the scene, he received a

28 phone call from a woman who claimed to be affiliated with TWC. This woman told him,

LAW OFFICES OF
ROBERT A. BALL

PLAINTIFF'S ORIGINAL COMPLAINT

1    "You've got to get the cameras.  Get the cameras." The individual responded that he

2    would do no such thing and the call ended. However, minutes later, he received a

3    second phone call from a male subject who also claimed to be affiliated with TWC. This

4    male subject also told him, "Go get the cameras."  Moments later, another person at the

5    accident scene approached this individual and stated that he, too, had received a call

6    from TWC with instructions to grab the cameras. The individual told this person not to

7    take the cameras, as it was a crime scene.

8         48.    TWC's Storm Wranglers television show, Season 1, Episode 1, "One Epic

9    Day" aired nationally on The Weather Channel on October 2, 2016 (hereinafter "OED").

10   TWC's Storm Wranglers television show, Season 1, Episode 2, "A Tale of Four Storms"

11   aired nationally on The Weather Channel on October 9, 2016 (hereinafter "TFS").  Each

12   episode demonstrates the level of the involvement that TWC had in the production of its

13   television show and in encouragement of "the chase" of severe storms and in the filming

14   of the recklessness of its employee storm chasers Williamson and Yarnall.  The first two

15   episodes were shot in Texas, Kansas and parts of Oklahoma.  The trailing credits set

16   forth the names of those involved at TWC in the production of Storm Wranglers.  In

17   addition to Williamson and Yarnall, during the filming, TWC had placed in the vehicle

18   being used by its stars one of three photographers, Michael Fomil, Bradley Reynolds

19   and Rodney Hall, employees of TWC and witnesses to Yarnall's driving.  The camera

20   equipment being used was TWC equipment.  The episodes OED and TFS that aired

21   show the involvement of TWC television personalities Chris Warren, Carl Parker, Dr.

22   Greg Forbes and Assistant Desk Editor Ryan Sloane, the latter of whom is dubbed by

23   Williamson as "Hash".  The episodes demonstrate the interface and interactions by and

24   between TWC and its broadcast studio named "The Lab" and Williamson and Yarnall,

25   demonstrating, as stated on air by TWC's Chris Warren, that they can monitor and watch

26   the video feed live being broadcast by Williamson and Yarnall and cut to that live and put

27   what is occurring in the field immediately on the national broadcast by simply raising his

28   hand and cutting to that feed. See, OED 3:25-3:58.  Graphics used by TWC in the show

LAW OFFICES OF
ROBERT A. BALL
225 Broadway, Suite 2200
San Diego, CA 92101, Suite
Telephone No. 619-234-3472

22

PLAINTIFF'S ORIGINAL COMPLAINT

explain the activity of Williamson and Yarnall in the field, showing live broadcasting from the vehicle they were operating (OED 10:13; 14:50; 32:46 [the latter showing Yarnall driving while talking on his cell phone] TFS 16:10; 26:10; 28:51; 31:17; 34:35; 35:10; 40:39). The episodes are replete with the "egging on" by Williamson to his driver Yarnall to "go, go, go" and "push it" and Yarnall's response "I've got it to the floor." The episode demonstrates these storm chasers acting as first responders calling 911 to report tornadoes and representing on the air "yes, this is Kelly Williamson, I'm with the Weather Channel". (OED 6:50).

49.     The fact that TWC was monitoring and directing its employees in the field is also evident in these episodes. At TFS at 21:54, Ryan Sloane, aka "Hash", is on the air from TWC's production room and he is instructing Williamson and Yarnall to "head west" and "hang around the Texas panhandle" and "head to Amarillo." That same individual, who appears many times on the national broadcast, tells Williamson to "call it" for the day and "breaking it down for the day" (TFS at 28:51). The bravado of TWC, Williamson and Yarnall are also demonstrated in these two episodes and the out and out actual boasting, touting and braggart of Williamson and Yarnall knowingly breaking the law is also evident. Williamson states in the program that "Randy would go anywhere I tell him to go, ask him to go, anywhere I ask him to go." (TFS at 31:10). Williamson states in Episode 1 that "Randy would drive through a brick wall if I told him to." (OED at 13:37). Williamson is interviewed by TWC for inclusion in the episode One Epic Day claiming that Yarnall "just goes where I say to go" and the very next scene edited into the program by TWC's staffing shows Williamson and Yarnall sitting at a red light when Williamson says to him "clean, go" and Yarnall drives through the red light (OED at 26:28-27:30). TWC's own editors found, edited and used video tape feed that supports Williamson's claims that Yarnall will drive through a brick wall, go wherever he tells Yarnall to go and do whatever he tells Yarnall to do, demonstrating that by showing Williamson having Yarnall drive through a red light right after a truck drives through the intersection from right to left in front of them. Once, when Williamson states "just lay it

LAW OFFICES OF
ROBERT A. BALL
225 Broadway, Suite 2200
San Diego, CA 92101-5054
tel service 619-238-1513

PLAINTIFF'S ORIGINAL COMPLAINT

1    on" and "get on it" and Yarnall responds "tell me what to do" and "I can't see", Williamson

2    states "That's ok" (OED at 35:50).

3        50.    TWC had actual knowledge of the poor driving habits of these individuals,

4    to the extent that it was apparent it was more likely Williamson and Yarnall would run a

5    stop sign than stop at a stop sign.  And Yarnall ran a stop sign killing Corbin Lee Jaeger.

6    TWC knew Williamson and Yarnall drove at unsafe speeds (Williamson states

7    "sometimes we might be going faster than we should be going" [TFS at 30:55]).  TWC

8    knew storm chasing was dangerous (TWC's Dr. Greg Forbes, "storm chasing is

9    dangerous", OED at 34:00).  TWC production and editing personnel as well as its on-air

10   personnel had direct link access to what Williamson and Yarnall were seeing and taping.

11   Much footage from Williamson's YouTube video feeds ended up in Episodes 1 and 2.

12   TWC had the opportunity to pull these two individuals off the road or hire a competent,

13   law abiding driver.  Instead, TWC made Williamson and Yarnall television stars, breaking

14   laws, driving on private property (TFS at 38:30), driving off road, in ditches, through hail

15   storms, drive the wrong way on freeway ramps, on the wrong side of the roadway,

16   through red lights and stop signs, all to increase the sense of danger to their television

17   audience and sell advertising and have a hit show.  The result was the death of young

18   Corbin Lee Jaeger.

19                                **VI.**

20                  **CAUSES OF ACTION**

21                  **COUNT ONE:**

22        **NEGLIGENCE AND GROSS NEGLIGENCE**

23       51.    Plaintiff re-alleges and incorporates by reference each of the allegations

24   set forth in the preceding paragraphs as if set forth fully and reiterated here in their

25   entirety.

26       52.    Accordingly, by their actions described herein, all of the Defendants were

27   negligent, grossly negligent and/or acted with malice in at least the following regards:

28           a.    TWC Defendants proximately caused the Subject Accident

LAW OFFICES OF
ROBERT A. BALL
223 Broadway, Suite 2200
San Diego, CA 92101-5031
Telephone (619) 234-3413

24

PLAINTIFF'S ORIGINAL COMPLAINT

and the death of JAEGER by operating a motor vehicle in violation of Texas Transportation Code §544.010 (failure to stop at stop sign);

b.    TWC Defendants proximately caused the Subject Accident and the death of JAEGER by operating a motor vehicle in violation of Texas Transportation Code §544.351 (failure to drive at a speed that was reasonable and prudent under the existing circumstances);

c.    Williamson and Yarnall proximately caused the Subject Accident and the death of JAEGER by operating a motor vehicle with a dangerously obstructed windshield;

d.    Williamson and Yarnall were acting within the course and scope of their employment and/or agency with TWC when the acts which proximately caused the death of JAEGER alleged herein occurred;

e.    TWC authorized, controlled, managed, encouraged and promoted the dangerous operation of a mobile live feed studio by their employees and/or agents, Williamson and Yarnall, inclusive of encouraging and promoting the dangerous operation of the Suburban in the filming and capturing of footage for both storm chasing as well as for the "STORM WRANGLERS" television show;

f.    High managerial agents of TWC, acting within their scope of office and/or employment, authorized, requested, commanded, performed, and/or recklessly tolerated and ignored the dangerous driving behavior of Yarnall and Williamson without regard for the safety of others; and

g.    TWC consciously and recklessly employed, promoted, managed and controlled two amateur storm chasers without sufficient training, supervision or experience to operate a mobile live feed broadcasting

25

LAW OFFICES OF ROBERT A. BALL

studio on public roadways during extreme weather events.

53.   Defendants' conduct described above constitutes gross negligence, recklessness, and/or intentional misconduct.

## COUNT TWO:

## WRONGFUL DEATH

54.   Plaintiff re-alleges and incorporates by reference each of the allegations set forth in the preceding paragraphs as if set forth fully and reiterated here in their entirety.

55.   Plaintiff brings this wrongful death claim against Defendants pursuant to Texas Civil Practice & Remedies Code sections 71.001-71.012.

56.   Plaintiff is a statutory beneficiary of JAEGER and relied on him for love, affection, comfort, protection and care.

57.   Plaintiff is the executor/administrator/representative of the Estate of CORBIN JAEGER.

58.   Defendants' wrongful acts caused the death of JAEGER.

59.   JAEGER would have been entitled to bring an action for his injuries had he lived.

60.   As a proximate result of Defendants' conduct, which caused the untimely death of JAEGER, Plaintiff is entitled to recover, in excess of the minimum jurisdictional limits of this Court.

## COUNT THREE:

## SURVIVAL ACTION

61.   Plaintiff re-alleges and incorporates by reference each of the allegations set forth in the preceding paragraphs as if set forth fully and reiterated here in their entirety.

62.   Plaintiff brings this survival action claim against Defendants pursuant to Texas Civil Practice & Remedies Code sections 71.021-71.022.

63.   Plaintiff is the legal representative of the Estate of CORBIN JAEGER. Prior

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5014
TELEPHONE 619.234.3413

PLAINTIFF'S ORIGINAL COMPLAINT

1    to his death, JAEGER had a survival action for himself for the pain and suffering and

2    expenses JAEGER sustained prior to his death. Plaintiff is appearing in the survival

3    action as the legal representative of the Estate of CORBIN JAEGER.

4         64.    Defendants' wrongful acts led to JAEGER's death.

5         65.    As a proximate result of Defendants' conduct, which led to the untimely

6    death of JAEGER, Plaintiff on behalf of the Estate of Corbin Lee Jaeger, deceased, is

7    entitled to recover, in excess of the minimum jurisdictional limits of this Court.

8                          **DAMAGES – ALL DEFENDANTS**

9         66.    Defendants' acts and/or omissions were the proximate cause of the

10   following injuries suffered by Plaintiff and decedent:

11        a.     Actual damages of not less than $125 million;

12        b.     Loss of affection, consortium, comfort, protection and care;

13        c.     Pain and suffering and mental anguish suffered by JAEGER

14               prior to his death;

15        d.     Mental anguish and emotional distress suffered by Plaintiff;

16        e.     Loss of quality of life;

17        f.     Funeral and burial expenses;

18        g.     Loss of service;

19        h.     Exemplary and punitive damages as well as reasonable

20               attorneys' fees authorized by law and costs of court;

21        i.     Prejudgment interest; and

22        j.     Post judgment interest.

23        67.    Plaintiff seeks un-liquidated damages in an amount that is within the

24   jurisdictional limits of the court.

25                          **CONDITIONS PRECEDENT**

26        68.    Defendants have actual notice of JAEGER's death and injuries complained

27   of herein. Any conditions precedent have occurred, been performed, or have been

28   waived.

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY ST., SUITE 2200
SAN DIEGO, CA 92101-5034
TELEPHONE 619-234-3413

27

PLAINTIFF'S ORIGINAL COMPLAINT

**DEMAND FOR JURY**

69.    Plaintiff hereby makes a demand for a jury trial.

**PRAYER**

Wherefore, Plaintiff prays that Defendants be cited to appear and answer herein and, upon final trial hereof, that Plaintiff recovers from Defendants not less than One Hundred Twenty-Five Million Dollars and No Cents ($125,000,000.00) in actual damages, exemplary damages, pre-judgment and post-judgment interest, costs of court, attorneys' fees all as authorized by law, and such other and further relief, both general and special, at law and in equity, to which they may be justly entitled.

DATED:  March 26, 2019          LAW OFFICES OF ROBERT A. BALL

By: _____
ROBERT A. BALL, SBN (CA) 00761
JOHN M. DONNELLY, SBN (CA 156965
Plaintiffs KAREN DI PIAZZA,
Individually and as Natural Mother to CORBIN
JAEGER and as
Executor/Administrator/Representative of the
Estate of CORBIN JAEGER, DECEASED
225 Broadway, Suite 2220, San Diego, California 92101
Telephone (619) 234-3913; Facsimile: (619) 234-4055
rball@robertballapc.com    jdonnelly@robertballapc.com

DATED:  March 26, 2019          MCCLESKEY HARRIGER BRAZILL & GRAF LLP

By: _____
BENJAMIN H. DAVIDSON, II, SBN 05430590
MARY KATHLEEN DAVIDSON, SBN 24070919
Plaintiffs KAREN DI PIAZZA,
Individually and as Natural Mother to CORBIN
JAEGER and as
Executor/Administrator/Representative of the
Estate of CORBIN JAEGER, DECEASED
5010 University Avenue, 5th Floor
Lubbock, Texas 79413
Telephone (806) 796-7306; Facsimile (806) 796-7365
bdavidson@mhbg.com    kdavidson@mhbg.com

LAW OFFICES OF
ROBERT A. BALL.
225 Broadway, suite 2200
san diego, ca 92101 5010
telephone 619 234 3913

28

PLAINTIFF'S ORIGINAL COMPLAINT