1  Robert A. Ball, California Bar No. 70061
   John M. Donnelly, California Bar No. 156965
2  LAW OFFICES OF ROBERT A. BALL
   225 Broadway, Suite 2220
3  San Diego, California 92101
   Telephone: (619) 234-3913; Facsimile: (619) 234-4055
4  Email: rball@robertballapc.com, jdonnelly@robertballapc.com

5  Benjamin H. Davidson, II, State Bar No. 05430590
   Mary Kathleen Davidson, State Bar No. 24070919
6  McCLESKEY HARRIGER BRAZILL & GRAF LLP
   5010 University Avenue, Suite 500
7  Lubbock, Texas 79413
   Telephone: (806) 796-7306; Facsimile: (806) 796-7365
8  Email: bdavidson@mhbg.com, kdavidson@mhbg.com

9  Attorneys for: Plaintiffs KAREN DI PIAZZA,
   Individually and as Mother to CORBIN JAEGER and as Personal
10 Representative of the Estate of CORBIN LEE JAEGER, Deceased

11             **UNITED STATES DISTRICT COURT**

12      **NORTHERN DISTRICT OF TEXAS, LUBBOCK DIVISION**

13
   KAREN DI PIAZZA, Individually and As        **PLAINTIFF'S FIRST AMENDED**
14 Mother to CORBIN JAEGER and As              **COMPLAINT**
   Personal Representative of the Estate of
15 CORBIN LEE JAEGER, Deceased,                **CASE NO. 5-19CV0060-C**

16                 Plaintiff,

17 v.

18 WEATHER GROUP TELEVISION, LLC
   dba THE WEATHER CHANNEL, a
19 Georgia limited liability company;
   WEATHER GROUP, LLC, a Delaware
20 limited liability company; CF
   ENTERTAINMENT, INC. dba
21 ENTERTAINMENT STUDIOS, a California
   corporation; ENTERTAINMENT STUDIOS
22 NETWORKS, INC., a California
   corporation; ENTERTAINMENT STUDIOS
23 MEDIA, INC., a California corporation;
   ENTERTAINMENT STUDIOS MEDIA
24 HOLDINGS, INC., a Delaware corporation;
   NBCUNIVERSAL MEDIA, LLC, a
25 Delaware limited liability company; BAIN
   CAPITAL INVESTORS, LLC, a Delaware
26 limited liability company; THE
   BLACKSTONE GROUP, INC., a Delaware
27 corporation; TV HOLDINGS 1, LLC, a
   Delaware limited liability company; TV
28 HOLDINGS 2, LLC, a Delaware limited

LAW OFFICES OF
ROBERT A. BALL                          1
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019    _____
TELEPHONE 619-234-3913          PLAINTIFF'S FIRST AMENDED COMPLAINT

1   liability company; TV SPINCO LLC, a
    Delaware limited liability company;
2   SHEENA BITTLE as Personal
    Representative of the Estate of KELLEY
3   GENE WILLIAMSON; KEITH DANIELS as
    Personal Representative of the Estate of
4   RANDALL D. YARNALL,

5              Defendants.

6

7   **PLAINTIFF'S FIRST AMENDED COMPLAINT**

8   TO THE HONORABLE UNITED STATES DISTRICT COURT:

9       COMES NOW KAREN DI PIAZZA, Individually and as Mother to CORBIN

10  JAEGER and as Personal Representative of the Estate of CORBIN LEE JAEGER,

11  Deceased ("Plaintiff"), complaining of WEATHER GROUP TELEVISION, LLC dba THE

12  WEATHER CHANNEL ("Weather Channel"); WEATHER GROUP, LLC ("Weather

13  Group"); CF ENTERTAINMENT, INC. dba ENTERTAINMENT STUDIOS ("CF");

14  ENTERTAINMENT STUDIOS NETWORKS, INC. ("Networks"); ENTERTAINMENT

15  STUDIOS MEDIA, INC. ("Media"); ENTERTAINMENT STUDIOS MEDIA HOLDINGS,

16  INC. ("Media Holdings"); NBCUNIVERSAL MEDIA, LLC ("NBC LLC"); BAIN CAPITAL

17  INVESTORS, LLC ("Bain"); THE BLACKSTONE GROUP, INC. ("Blackstone"); TV

18  HOLDINGS 1, LLC ("TV1"); TV HOLDINGS 2, LLC ("TV2"); TV SPINCO LLC ("Spinco")

19  (Weather Channel, Weather Group, CF, Networks, Media, Media Holdings, NBC LLC,

20  Bain, Blackstone, TV1, TV2, and Spinco will hereafter be collectively referred to as

21  "TWC"); SHEENA BITTLE as Personal Representative of the Estate of KELLEY GENE

22  WILLIAMSON ("ESTATE OF WILLIAMSON"); KEITH DANIELS as Personal

23  Representative of the Estate of RANDALL D. YARNALL ("ESTATE OF YARNALL") (all

24  named Defendants above shall hereafter be collectively referred to as "TWC

25  Defendants"), with this First Amended Complaint alleges as follows:

26  ///

27  ///

28  ///

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

2

PLAINTIFF'S FIRST AMENDED COMPLAINT

I.

## NATURE AND PURPOSE OF THE ACTION

1.     This action is brought by the heir and Estate of CORBIN LEE JAEGER (DOB-6/11/91) ("JAEGER") who was killed in a horrific two-vehicle collision outside the town of Spur, Texas on March 28, 2017. JAEGER was killed when a Chevrolet Suburban SUV, Missouri License Plate Number 7SY297 ("Suburban"), driven by Randall Yarnall ("Yarnall") and occupied by Kelley Gene Williamson ("Williamson") ran a stop sign at seventy (70) miles per hour while racing towards a tornado to film that tornado on behalf of TWC and collided with JAEGER'S vehicle, a 2012 Jeep Patriot ("Jeep"), while the Jeep had the right of way on westbound FM2794. The accident occurred approximately 55 miles southeast of Lubbock and 5 miles west of the town of Spur, in Dickens County, Texas, at the intersection of FM 2794 and County Road 419, the latter also known as Farm to Market Road 1081 ("FM 1081") (all collectively, the "Subject Accident").

2.     Yarnall and Williamson, who also died in the collision, were in the course and scope of their employment as storm chasers and television personalities with TWC when their Suburban ran the stop sign on northbound FM 1081. Plaintiff alleges that the Suburban, which was filled with broadcasting, radar and other storm chasing equipment, was being operated by and for the benefit of TWC as a mobile broadcasting studio and to film severe weather and to collect film footage for the TWC show "STORM WRANGLERS, SEASON 2," which television show starred Williamson and Yarnall as storm chasers, inclusive of chasing tornados across the United States, when it collided with the Jeep being driven by JAEGER. Furthermore, Yarnall and Williamson had a history of reckless driving when storm chasing and when filming TWC's television programming, which was well known among other storm chasers and TWC. TWC was aware of this history because it: (1) had been warned by other storm chasers on several occasions before the Subject Accident that Yarnall and Williamson's driving put others at risk; and (2) had witnessed the pair's dangerous driving during live video feeds of their storm chasing, which was broadcast to TWC's studio and in the editing of its television

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

3

PLAINTIFF'S FIRST AMENDED COMPLAINT

1  program, STORM WRANGLERS. However, despite this knowledge of the risk posed by
2  their employees/agents, TWC continued to allow Yarnall and Williamson to work as on-
3  air storm chasers and to record footage of "the chase" and of storms to be used in the
4  "STORM WRANGLERS" television program, which ultimately led to JAEGER'S tragic
5  and completely avoidable demise.

6       3.    Plaintiff brings these wrongful death and survivor claims under <u>Texas Civil</u>
7  <u>Practice & Remedies Code</u> sections 71.002 and 71.021 to recover damages for the
8  death of JAEGER, which were directly and proximately caused by the acts and
9  omissions of Defendants.

10                                    II.

11                      JURISDICTION AND VENUE

12       4.    This court has original jurisdiction over this action pursuant to 28 U.S.C. §
13  1332 in that the controversy exceeds the sum or value of $75,000, exclusive of interest
14  and costs, and is between citizens of different States.

15       5.    Venue is appropriate in the United States District Court; Northern District of
16  Texas, Lubbock Division, since the town of Spur, in Dickens County, Texas was the
17  location of the Subject Accident that is the basis of the causes of action set forth herein.

18                                    III.

19                                 PARTIES

20       6.    Plaintiff KAREN DI PIAZZA ("Plaintiff") resides in Glendale, Arizona, is a
21  citizen of the State of Arizona, and is the mother of the decedent, JAEGER, who was
22  also a resident of and domiciled in the state of Arizona at the time of his death. Plaintiff is
23  also the Personal Representative of the Estate of CORBIN LEE JAEGER.  The Estate of
24  CORBIN LEE JAEGER is being administered in the Superior Court of Arizona, County of
25  Maricopa, the case titled *In the Matter of the Estate of Corbin Lee Jaeger, Deceased*,
26  Case No. PB 2018-001588.

27       7.    Defendant WEATHER GROUP TELEVISION, LLC dba THE WEATHER
28  CHANNEL, is a Georgia limited liability company ("Weather Channel") having its

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

4

PLAINTIFF'S FIRST AMENDED COMPLAINT

1   principal place of business located at 300 Interstate North Parkway SE, Atlanta, GA
2   30339.  Weather Channel's sole member is defendant WEATHER GROUP, LLC, a
3   Delaware limited liability company ("Weather Group"). Weather Group's sole members
4   are defendants TV HOLDINGS 1, LLC ("TV1") and TV HOLDINGS 2, LLC ("TV2"). TV1's
5   sole member is Byron Allen Folks ("FOLKS"), an individual, who is a citizen of the State
6   of California. TV2's sole member is also FOLKS. Service of Process may be had on the
7   Weather Channel by service of its registered agent, REGISTERED AGENT
8   SOLUTIONS, INC. at 900 Old Roswell Lake Pkwy, Suite 310, Roswell, GA 30076.
9   Plaintiff is informed and believes, and thereon alleges, that Williamson and Yarnall were
10  the employees and/or agents of the Weather Channel and were acting within the course
11  and scope of that employment and/or agency at all times alleged herein.

12      8.      Defendant Weather Group, LLC is a Delaware limited liability company
13  having its principal place of business located at 300 Interstate North Parkway SE,
14  Atlanta, GA 30339. Weather Group's sole members are TV1 and TV2, whose sole
15  member is FOLKS, who is a citizen of the State of California. Service of Process may be
16  had on Weather Group by service of its registered agent, REGISTERED AGENT
17  SOLUTIONS, INC. at 9 E. Loockerman Street, Suite 311, Dover, DE 19901; 900 Old
18  Roswell Lake Pkwy, Suite 310, Roswell, GA 30076.  Plaintiff is informed and believes,
19  and thereon alleges, that Williamson and Yarnall were the employees and/or agents of
20  Weather Group, LLC and were acting within the course and scope of that employment
21  and/or agency at all times alleged herein.

22      9.      [RESERVED].

23      10.     [RESERVED].

24      11.     Defendant CF ENTERTAINMENT, INC. dba ENTERTAINMENT STUDIOS
25  ("CF") is a corporation incorporated under the laws of the State of California, and having
26  its principal place of business located at 1925 Century Park East, 10th Floor, Los
27  Angeles, CA 90067. Service of process may be had on CF by service of its registered
28  agent, REGISTERED AGENT SOLUTIONS, INC. at 1220 S St., Suite 150, Sacramento,

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

5

PLAINTIFF'S FIRST AMENDED COMPLAINT

1  CA 95811.

2       12.     Defendant ENTERTAINMENT STUDIOS NETWORKS, INC. ("Networks"),

3  is a corporation incorporated under the laws of the State of California, and having its

4  principal place of business located at 1925 Century Park East, 10th Floor, Los Angeles,

5  CA 90067. Service of process may be had on Networks by service of its registered

6  agent, REGISTERED AGENT SOLUTIONS, INC. at 1220 S St., Suite 150, Sacramento,

7  CA 95811.

8       13.     Defendant ENTERTAINMENT STUDIOS MEDIA, INC. ("Media") is a

9  corporation incorporated under the laws of the State of California, and having its principal

10  place of business located at 1925 Century Park East, 10th Floor, Los Angeles, CA

11  90067. Service of process may be had on Media by service of its registered agent,

12  REGISTERED AGENT SOLUTIONS, INC. at 1220 S St., Suite 150, Sacramento, CA

13  95811.

14       14.     Defendant ENTERTAINMENT STUDIOS MEDIA HOLDINGS, INC. ("Media

15  Holdings") is a corporation incorporated under the laws of the State of Delaware, and

16  .having its principal place of business located at 1925 Century Park East, 10th Floor, Los

17  Angeles, CA 90067. Service of process may be had on Media Holdings by service of its

18  registered agent, REGISTERED AGENT SOLUTIONS, INC. at 9 E. Loockerman Street,

19  Suite 311, Dover, DE 19901.

20       15.     Defendant NBCUNIVERSAL MEDIA, LLC ("NBC LLC"), is a Delaware

21  limited liability company having its principal place of business located at 30 Rockefeller

22  Plaza, New York, NY 10112. NBC LLC's sole member is Comcast Corporation, a

23  corporation incorporated under the laws of the State of Pennsylvania, having its principal

24  place of business located at Comcast Center, 1701 JFK Boulevard, Philadelphia, PA

25  19103. Service of process may be had on NBC LLC by service of its registered agent,

26  ENTERPRISE CORPORATE SERVICES LLC at 1201 N. Market Street, Suite 1000,

27  Wilmington, DE 19801.

28       16.     [RESERVED].

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

6

PLAINTIFF'S FIRST AMENDED COMPLAINT

1    17.    Defendant BAIN CAPITAL INVESTORS, LLC ("Bain") is a Delaware limited
2  liability company having its principal place of business located at Two Copley Place, 7th
3  Floor, Boston, MA 02116. Bain's sole members are Joshua Bekenstein and Willard Mitt
4  Romney. Joshua Bekenstein is a citizen of the State of Massachusetts, and Willard Mitt
5  Romney is a citizen of the State of Utah. Service of process may be had on Bain by
6  service of its registered agent, MAPLES FIDUCIARY SERVICES (DELAWARE) INC. at
7  4001 Kennett Pike, Suite 302, Wilmington, DE 19807.

8    18.    Defendant THE BLACKSTONE GROUP, INC. ("Blackstone") is a
9  corporation incorporated under the laws of the State of Delaware, and having its principal
10  place of business located at 345 Park Avenue, New York, NY 10154. Service of process
11  may be had on Blackstone by service of its registered agent, THE CORPORATION
12  TRUST COMPANY at Corporation Trust Center 1209 Orange St., Wilmington, DE
13  19801.

14    19.    Defendant TV HOLDINGS 1, LLC ("TV1") is a Delaware limited liability
15  company having its principal place of business located at 1925 Century Park East, 10th
16  Floor, Los Angeles, CA 90067. TV1's sole member is FOLKS, an individual, who is a
17  citizen of the State of California. Service of process may be had on TV1 by service of its
18  registered agent, REGISTERED AGENT SOLUTIONS, INC. at 9 E. Loockerman Street,
19  Suite 311, Dover, DE 19901.

20    20.    Defendant TV HOLDINGS 2, LLC ("TV2") is a Delaware limited liability
21  company having its principal place of business located at 1925 Century Park East, 10th
22  Floor, Los Angeles, CA 90067. TV2's sole member is FOLKS, an individual, who is a
23  citizen of the State of California. Service of process may be had on TV2 by service of its
24  registered agent, REGISTERED AGENT SOLUTIONS, INC. at 9 E. Loockerman Street,
25  Suite 311, Dover, DE 19901.

26    21.    Defendant TV SPINCO LLC ("Spinco") is a Delaware limited liability
27  company having its principal place of business located at 300 Interstate North Parkway
28  SE, Atlanta, GA 30339. On or about January 29, 2016, Spinco changed its name to

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

7

PLAINTIFF'S FIRST AMENDED COMPLAINT

1  defendant Weather Group, LLC. Defendant Weather Group LLC's sole members are

2  TV1 and TV2, whose sole member is FOLKS, a citizen of the State of California. Service

3  of process may be had on Spinco by service of its registered agent, REGISTERED

4  AGENT SOLUTIONS, INC. at 9 E. Loockerman Street, Suite 311, Dover, DE 19901.

5      22.    Service of Process may be had on Defendant SHEENA BITTLE, a citizen

6  of the State of Missouri, as Personal Representative of the Estate of KELLEY GENE

7  WILLIAMSON ("ESTATE OF WILLIAMSON") by service on Defendant SHEENA BITTLE

8  at 15223 Farm Road 1010, Exeter, Missouri 65647. The ESTATE OF WILLIAMSON is

9  being administered in the Barry County Circuit Court, state of Missouri, entitled *In re the*

10 *Estate of Kelly Gene Williamson*, Case No. 17BR-PR00069.

11     23.    Service of Process may be had on Defendant KEITH DANIELS, a citizen of

12 the State of Missouri, as Personal Representative of the Estate of RANDALL D.

13 YARNALL ("ESTATE OF YARNALL") by service on Defendant KEITH DANIELS at 102

14 West Street, Suite 5, Cassville, Missouri 65625, 417-847-0541. The ESTATE OF

15 YARNALL is being administered in the Barry County Circuit Court, state of Missouri,

16 entitled *In re the Estate of Randall D. Yarnall, Deceased*, Case No. 18BR-PR00052.

17     24.    Plaintiff is informed and believes and thereon alleges that at all times

18 herein mentioned, one or more and/or each of the TWC Defendants named herein, was

19 and now is the principal, agent, servant, employee, assignee, joint venturers,

20 predecessor-in-interest, successor-in-interest, aider and abettor, and/or co-conspirator of

21 each TWC Defendant, and in doing the things hereinafter alleged, were acting in the

22 course and scope of their authority as principals, agents, servants, employees,

23 assignees, joint venturers, predecessors-in-interest, successors-in-interest, and/or co-

24 conspirators and in the furtherance of such relationships, and with the full knowledge,

25 acquiescence, authorization, permission and consent of their Co-defendants, as

26 principals, and at their direction, instance and request.  TWC Defendants shared a

27 community of interest with each and one another and were intricately involved in the

28 principal enterprises of storm chasing, filming extreme weather conditions and in reality

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

8

PLAINTIFF'S FIRST AMENDED COMPLAINT

1  television programming through the national broadcasting of their collective body of work

2  for which TWC Defendants received huge benefits and compensation through branding,

3  good will, advertisements and the airing of commercials.   Plaintiff is informed and

4  believes that TWC programming is received and viewed in approximately 80 million

5  households in the United States and TWC broadcasts approximately 90 hours of live

6  content weekly (*See*, Nielsen's June 2018 Universe Estimate).   Plaintiff is further

7  informed and believes and thereon alleges that each such TWC Defendant committed,

8  participated in, partnered, approved, consented to, ratified, authorized, directed, or

9  performed the acts, omissions, transactions and occurrences which constitute the

10  subject matter of this action.

11      25.   Plaintiff is informed, believes, and based thereon alleges that at all times

12  herein mentioned, each of the TWC Defendants, was the alter ego of each other TWC

13  Defendant.  There is such a unity of interest and control between and among the TWC

14  Defendants, and each other, that their separate identities have ceased to exist, or never

15  did exist.  To treat each entity Defendant as separate entities would perpetuate a fraud

16  or result in gross injustice.

17                                    **IV.**

18                            **CHOICE OF LAW**

19      26.   Plaintiff alleges a conflict exists between the substantive law of Texas and

20  Arizona, Plaintiff's domicile, with respect to the following germane issues:  (1)

21  comparative fault; (2) Plaintiff's right to recover exemplary damages under **COUNT TWO**

22  alleged herein; and (3) the amount of exemplary damages potentially available to

23  Plaintiff under **COUNT I, COUNT II** and **COUNT III** alleged herein. Plaintiff requests the

24  Court apply Arizona law as to these issues as opposed to Texas law to fully compensate

25  Plaintiff (*see*, *Sulak v. American Eurocopter Corp.*, 901 F.Supp.2d 834 (N.D. Texas

26  2012). As to comparative fault, Plaintiff requests the Court apply Ariz. Rev. Stat. § 12-

27  2505 (in conflict with Tex. Civ. Prac. & Rem. Code Ann. § 33.001). As to Plaintiff's right

28  to recover exemplary damages under **COUNT II** for the wrongful death of her adult son,

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

9

PLAINTIFF'S FIRST AMENDED COMPLAINT

1 JAEGER, Plaintiff requests the Court apply Ariz. Rev. Stat. § 12-613 [*see also, Quinonez*

2 *v. Anderson,* 144 Ariz. 193, 696 P.2d 1342 (Ariz. Ct. App. 1984)] [in conflict with Tex.

3 Const. art. 16, § 26; *General Chemical Corp. v. De La Lastra,* 852 S.W.2d 916, 923

4 (Tex. 1993)]. As to the amount of exemplary damages potentially available to Plaintiff

5 under **COUNT I, COUNT II** and **COUNT III,** Plaintiff requests the Court apply Arizona

6 substantive law, which does not recognize a fixed standard for the amount of punitive

7 damages that may be assessed (in conflict with Tex. Civ. Prac. & Rem. Code Ann. §

8 41.008).

## V.

## FACTS PARTICULAR TO PLAINTIFF'S CLAIMS

**a.** *Live stream video footage leading up to the collision.*

  27. Williamson and Yarnall were well-known storm chasers for TWC and stars of the TWC show "STORM WRANGLERS". According to Williamson's Facebook profile, Williamson started working at TWC on February 26, 2016, listing his occupation as "Storm Chaser at The Weather Channel, covering all weather events via Live Stream as it is happening." Plaintiff is informed and believes and thereon alleges that Yarnall became Williamson's driving partner on April 9, 2016. Plaintiff is further informed and believes and thereon alleges that on or about the summer of 2016, Williamson and Yarnall were approached by TWC to star in a new television show ultimately named "STORM WRANGLERS" in which Williamson and Yarnall, among other job duties, would operate the Suburban to record video footage to be used by TWC employees, to wit, video editors, producers and directors of TWC, to produce the television show "STORM WRANGLERS" for national broadcast. TWC directly financially benefited from the broadcast of "Storm Wranglers" through the sale of advertising and through promotion of TWC itself. TWC's concept of the new show, modeled after David Chun's work on The Ultimate-Fighter (mixed martial arts cage fighting) a Fox Sports Network sporting television broadcast, was described by TWC's own employee, Mina Valizadeh, Direction and Motion Designer, who was responsible for concept development, storyboarding,

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

10

PLAINTIFF'S FIRST AMENDED COMPLAINT

1   design and animation of the TWC Storm Wrangler show package, as follows: "Storm
2   Wranglers is a long form show produced by the Weather Channel which presents the
3   adventures of two Storm chasers from Texas: Kelly Williamson and Randy Arnold (sic).
4   The concept is introducing the storm wranglers as two heroes when they start the
5   adventure of chasing a storm. The combination of footage and high contrast illustrations
6   are the general look and direction of the show. The quick cuts between illustrative
7   animation and real footage capture the heroic and urgent feeling of the show." Further,
8   Ms. Valizadeh states: "The concept is showing Kelley as the hero. The combination of
9   footage and cutting into moving high contrast illustration of him and his environment will
10  be the general look and direction. The cuts and quick motion bring a sense of thrill for
11  the    adventure    he    will    be    going    through.    Here    is    the    inspiration    link:
12  http://davidychun.com/The -Ultimate Fighter." TWC's concept of presenting storm
13  chasing as an adventurous, thrilling sporting event and to make its two stars "heroes"
14  resulted in the violent death of young JAEGER. TWC Defendants were operating TWC's
15  mobile broadcasting studio (the Suburban) at approximately 70 miles per hour racing
16  northbound on FM 1081 to film a tornado when it ran the stop sign at that speed at the
17  intersection of FM 1081 and FM 2794 and struck the Jeep being operated by JAEGER,
18  killing him. JAEGER was lawfully driving westbound on FM2794 and away from that
19  tornado. JAEGER was pronounced dead at the scene by first responders and the
20  Dickens County Coroner.

21      28.    Williamson and Yarnall were working in these capacities at the time of the
22  collision. More specifically, Williamson and Yarnall were filming severe weather and live-
23  streaming the footage to Williamson's Facebook account and YouTube channel, as well
24  as to TWC's Facebook account, at the moment the two vehicles collided when the
25  Suburban driven by Yarnall ran the stop sign for its path of travel on Northbound FM
26  1081. The video Williamson live-streamed to his YouTube channel, "03-28-17 Tracking
27  Storms in West Texas" ("Video"), contains this footage. The duration of the Video is 2
28  hours, 28 minutes, and 21 seconds ("2:28:21"), and it showcases Williamson and

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

11

PLAINTIFF'S FIRST AMENDED COMPLAINT

1  Yarnall's travels throughout Texas that day. Due to lag between the audio and video, the

2  Video freezes at 2:25:49, at the moment the Defendants approached the stop sign,

3  immediately prior to the collision, at approximately 70 miles per hour. Defendants failed

4  to stop at that stop sign causing the collision and killing JAEGER. The failure to stop at

5  this stop sign was Defendants' fourth such traffic violation that day.

6      29.    Throughout the Video, the two can be heard speaking to their employers at

7  TWC. At 2:13:30, Williamson tells the audience his stream is being shown on TWC's

8  Facebook live.   At 2:17:00, Mr. Scott Thompson, Director of Newsgathering for TWC,

9  calls Williamson and speaks to him for over a minute. At 2:21:02, a woman's voice says,

10 "Hey Kelley, they still have you up on The Weather Channel full screen." At 2:21:16,

11 Defendants' radar spotter, Barry Gray, says, "Kelley, you're on The Weather Channel full

12 screen."  At 2:21:58, a contact listed in Williamson's phone as "TWC The Weather

13 Cha..." calls him; the conversation lasts until 2:25:19.  Williamson was streaming the

14 day's footage to TWC and had been in contact with TWC contemporaneously with the

15 Subject Accident.

16      30.    The Video also showcases four other instances of Williamson and Yarnall

17 running stop signs, besides the one that led to the Subject Accident, at 1:05:10, 1:08:15,

18 2:03:27, and 2:06:08.  The running a stop sign incident at 2:03:27 occurs at the same

19 intersection where the Subject Accident occurred as Williamson and Yarnall travel

20 southbound on FM 1081.   At 2:25:49, they approach the intersection of the Subject

21 Accident for the last time, traveling northbound on FM 1081. Prior to that stop sign, four

22 signs indicate the approach of a stop-controlled intersection.  The first warning is a

23 "Highway Intersection Ahead" sign. After this, a "JCT 2794 Farm Road" sign indicates

24 the approaching junction with FM 2794.  After this, there is a stop sign warning sign.

25 After this, a sign indicates that the city of Spur is to the right, and White River Lake is to

26 the left, implying that these locations are accessible via FM 2794.  Finally, there is the

27 stop sign, itself.  The Video ends abruptly just before the collision, as the Suburban

28 travels full-speed towards the stop sign.  The warning signs, as well as the stop sign,

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

12

PLAINTIFF'S FIRST AMENDED COMPLAINT

1    itself, are all clearly visible and unobstructed through the lens of the video equipment
2    being used and deployed by the TWC Defendants.    At this time, Defendants were
3    attempting to track down and film tornadoes in the region, and at the time of the Subject
4    Accident it was raining.  It is believed their speed at the time of driving through the stop
5    sign and at impact with the Jeep was approximately 70 miles per hour. Notably, no one
6    from TWC mentions or refers to the pair's blatant and repeated traffic violations during
7    the Video.

8    **b.     The Suburban's windshield was dangerously obstructed.**

9        31.    While the stop sign before the intersection of the Subject Accident was
10   unobstructed, the windshield of the Suburban operated by Defendants was obstructed.
11   Defendants had an array of expensive storm tracking and broadcast equipment, which
12   Plaintiff is informed and believes and thereon alleges, was paid for and installed by
13   TWC. This equipment dangerously limited Defendants' field of vision. Photos and video
14   that Yarnall and Williamson uploaded to their respective social media accounts
15   showcase the poor visibility they had from their positions in the Suburban. In a
16   December 29, 2016 interview on the podcast "Storm Front Freaks," Williamson stated, "If
17   anyone's ever seen [the Suburban], they wonder how I get in it.  I've got a pretty good-
18   sized computer sitting here in front of me and one camera up in the windshield and then
19   I've got another console here that I run a camera that's actually up on top of my vehicle.
20   Then I've got up on the dash a live view that I actually stream back to TWC with.  It's
21   kind of like crawling into a cockpit.  There's not a lot of room."  In another live-stream
22   broadcast uploaded to his YouTube channel two days before the subject accident titled
23   "03-26-17 Tracking Storms in Okla and Texas", Williamson actually states at mark 13:09
24   on the stream, while speaking live with TWC, "A lot of times, you can see more in your
25   camera lens than you can actually by eye, so I've actually got a screen in front of me that
26   I pretty much watch and a lot of times I can see more on it than by looking out the
27   windows."

28       32.    This equipment also dangerously obstructed the view of the Suburban's

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

13

PLAINTIFF'S FIRST AMENDED COMPLAINT

1   driver, Yarnall. A photograph depicting the driver's perspective from inside the Suburban
2   taken about twenty minutes before the Subject Accident occurred shows Yarnall's
3   cellphone mounted on the bottom left portion of the windshield, with a radar application
4   open on the screen, showcasing the region's weather patterns. Thus, Yarnall, the
5   designated driver, had access to, used and deployed, while driving, TWC equipment that
6   distracted Yarnall in the operation of the Suburban and obstructed his view of the
7   roadway.

8   **c.    *Williamson and Yarnall were habitually reckless and dangerous.***

9          33.    The reckless and irresponsible driving employed by Williamson and Yarnall
10  and TWC on the day of the Subject Accident was, unfortunately, not an aberration. To
11  the contrary, it was the culmination of a long and well-documented history of dangerous
12  behavior behind the wheel. In other videos on Williamson's YouTube channel, which
13  showcase entire days of storm chasing, Williamson and Yarnall show time and again
14  their disregard of basic traffic safety laws. In just fourteen (14) of these videos (a mere
15  fraction of roughly 223 posted videos), the pair runs approximately eighty (80) stop
16  signs, four (4) red lights, and one (1) out-of-service traffic light.  Williamson, who directed
17  Yarnall's driving while storm chasing, can often be heard saying, "Clear," informing
18  Yarnall that he (Yarnall) has the go-ahead to ignore the stop signal.   Further, they
19  frequently drove at high speeds in severe weather conditions and made dangerous,
20  illegal passes of other cars, even with hail on the ground.  Williamson can sometimes be
21  heard instructing Yarnall to make these maneuvers, as one example: "If you can, get
22  around them."  There are also numerous instances of the pair driving on the wrong side
23  of the road, both by accident and by design.  Williamson also frequently encouraged
24  Yarnall to drive more aggressively in order to get into better positions from which to film
25  storms, especially when they were out of position or in the wrong town.  He often made
26  comments like: "Go, go, go Randy. This is something you don't get much. Keep going";
27  "That way, straight ahead, just lay it on"; "Keep going, keep going Randy"; "Get on it, get
28  on it, come on, get it up there.  Take it out of four-wheel drive"; "Fifty – not going fifty.

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

14

PLAINTIFF'S FIRST AMENDED COMPLAINT

1  Crank it"; "Just go as hard as you can." "Get back in it if you can." "We're getting out of

2  it." "See if you can get in this one"; and "Gonna need to get up here as quick as we can.

3  Just do what you can do to get us up there."  Williamson even joked about Yarnall's

4  aggressive driving: "We're gonna be testing Randy's driving skills today"; "Yeah, I got

5  Randy driving.  He's my nitrous tanks"; and "I could say you drove your ass off."

6         34.    Yarnall also made light of his own driving behavior. On October 8, 2016,

7  Williamson posted a photo to his Facebook account of the Suburban, with TWC's logo

8  on the rear passenger door, getting its transmission replaced, with the following caption:

9  "'Just about has a new transmission' – at Jon Murdock Chevrolet Cadillac Mitsubishi."

10  An individual commented on the photo, implying that Yarnall's aggressive driving was

11  the cause for the need of a new transmission: "Randy's hot rodding?"  Yarnall replied to

12  the post "Go go go lol [sic]."  On October 26, 2016, Yarnall made his Facebook profile

13  picture a short, repeating video of a tornado.  The footage appears to have been shot

14  from the driver's side window while the vehicle was in motion, as the driver's side mirror

15  was closely visible in the video and one can see trailing traffic in that mirror.  An

16  individual posted a comment asking, "What is the location?"  Yarnall replied, "That was

17  the Dodge city one in may [sic].  Cell phone out the window."  Another individual

18  commented on the same video: 'I remember thinking at the time "please lord, two hands

19  on the wheel…"'  In response, Yarnall replied, "Lol."  It appears that Yarnall filmed the

20  tornado with his cell phone being held and operated by his left hand out the driver's side

21  window of the vehicle he was driving and then bragged about it on social media.

22  Further, in one of Williamson's storm chasing videos "02-28-17 Tracking Severe Storms

23  in Missouri 2", taken one month prior to the subject accident, Williamson mentioned that

24  TWC was following their live stream: "They're listening.  Scott [Thompson]'s listening."

25  Yarnall responded, "If you're listening, hang on.  I'm gonna have to do some offensive

26  driving."  Roughly eight minutes later at 31:56, Yarnall and Williamson run a stop sign

27  while turning left at an intersection as it hails.

28  ***d.    TWC consistently monitored and directed Williamson and Yarnall.***

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

15

PLAINTIFF'S FIRST AMENDED COMPLAINT

1    35.    In-studio representatives of TWC and the COMPANY monitored and
2   worked very closely with Williamson and Yarnall as Williamson live-streamed so that the
3   in-studio, on-camera anchors could showcase his live-streams and interview him when
4   he captured particularly exciting footage.  In a video "03-24-17 Tracking Storms in NE
5   Texas" (50:37 duration), just four (4) days prior to the fatal collision, Williamson and
6   Yarnall were parked, filming rain and clouds, while trying to determine their plan of
7   action.  At 32:45, Williamson received a text from TWC and Williamson says, "They said
8   they're listening to you reading the radar, Randy.  Are you talking to yourself?  This
9   thing's turned up too high.  I think they can hear us think."  Yarnall had been muttering to
10  himself under his breath while evaluating the storm's radar data, and someone at TWC
11  texted Williamson to inform him that they could hear Yarnall doing so.  In another video
12  from the same day, "03-24-17 Tracking Storms in NE Texas" (10:27:37 duration),
13  Williamson went live on TWC with TWC's employee, Chris Warren ("Warren") at 6:11:34.
14  Towards the end of their live session, Warren states, "Alright, storm tracker Kelley
15  Williamson.  You keep an eye on the sky, and we'll keep an eye on your camera, and we
16  will check back on you a little later."  Warren then stated on-air that TWC would continue
17  to watch Williamson's live-stream.  Such occurrences are commonplace throughout the
18  numerous videos posted by Williamson.

19    36.    These in-studio TWC representatives did more than monitor the pair's
20  footage; they instructed Williamson and Yarnall to perform certain actions.  For example,
21  in the video "03-15-17 Tracking Lake Effect Snow" (6:47:15 duration), the pair decided to
22  find a suitable location to pull over so that they could remove ice accumulated on the
23  equipment mounted to the vehicle's roof.  At 1:11:30, they pull into a car wash, and the
24  camera is directed at a wall as Williamson removes the ice.  Less than five minutes later
25  at 1:16:18, Yarnall informs Williamson that TWC notified him via Facebook that he
26  needed to move his camera to capture a better image than the wall in front of their
27  vehicle.  In response, Williamson promptly readjusted the camera to face outside of the
28  car wash to capture the snowy weather conditions. It was not unusual for Williamson and

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

16

PLAINTIFF'S FIRST AMENDED COMPLAINT

1  Yarnall to receive such specific directives from TWC. In other videos, TWC informed
2  them of the days they would be working and the days they would have off, as well as the
3  locations to which they would be sent.

4       37.   In another video, "01-21-2017 Tracking Storms in Dixie Alley" (5:11:02
5  duration), TWC used the Suburban as a mobile broadcasting studio. In this footage shot
6  near Hattiesburg Mississippi, Williamson and Yarnall transport two local residents injured
7  by a tornado to a local hospital. In route, Williamson, Yarnall and TWC turn on the
8  Suburban's onboard cameras and conduct an interview of the tornado victims, which
9  was broadcast live nation-wide from the interior of the moving Suburban.

10 **e.    TWC encouraged the pair's recklessness and set the stage for this tragedy.**

11      38.   TWC characterized and advertised Williamson and Yarnall's show
12 "STORM WRANGLERS" as a dangerous enterprise. The name "STORM WRANGLERS"
13 itself connotes rushing into harm's way, riding and wrestling storms. The "logo" for the
14 "STORM WRANGLERS" television show depicts Williamson and Yarnall roping a
15 tornado.  Instead of using meteorologists experienced in the tracking of tornados,
16 however, TWC knowingly chose two chicken farmers and cattle ranchers from Missouri
17 without any emergency/first responder or meteorological training to star in their show.
18 TWC then instructed them to barrel into dangerous weather conditions to obtain footage,
19 needlessly endangering local residents fleeing impending catastrophe and trained first
20 responders.

21      39.   On September 29, 2016, TWC issued a press release: 'Network
22 Announces "Storm Wranglers" Two-Week Event.'  The announcement stated, 'The
23 Weather Channel will also [show] "Storm Wranglers," a special two-week event kicking
24 off Sunday, October 9 at 9 p.m. EST.  Storm Tracker Kelley Williamson and partner
25 Randy Yarnall go head-to-head with every storm imaginable including powerful
26 tornadoes and supercell thunderstorms.  The Missourian duo truly love tracking storms
27 in a down-home, authentic way.' It stated further, "[Williamson] has become the eyes and
28 ears on the ground for the network when viewers need help the most." The article quoted

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

17

PLAINTIFF'S FIRST AMENDED COMPLAINT

1   Howard Sappington, identified as the Vice President of Programming for TWC, saying,

2   'Kelley in particular is such an interesting and passionate character, and we feel lucky to

3   have him as part of our family.  We believe both "Storm Wranglers" and "Weather Gone

4   Viral" will not only prove to be very exciting to audiences but deliver on our promise to

5   viewers to return to our weather roots.'  TWC released the first episode of "STORM

6   WRANGLERS" on October 2, 2016 and released the second episode on October 9,

7   2016.  Underneath the announcement, TWC described a "recently launched community

8   platform, weloveweather.tv," which serves as a website for fans of TWC, operated by

9   TWC.

10         40.    On weloveweather.tv, a post by "The Weather Channel Staff" on

11   September 26, 2016 showcased an "Exclusive Preview of Storm Wranglers!"  Part of this

12   promotion included an online question and answer session with Williamson, where he

13   posted a short biography and answered questions. On September 26, Williamson wrote,

14   "In order to be a storm chaser you must: understand the dangers and know your vehicle

15   and your limitations on muddy dirt roads."  He continued, "What makes me different from

16   other storm trackers: when I go chasing I go with the objective of streaming a tornado to

17   the public or The Weather Channel.  If I could not stream I would not go."  He continued,

18   "I am not a meteorologist and I'm not an actor but I love chasing tornadoes enough that I

19   think it overcomes my weaknesses."  In a question about his partner Yarnall, he wrote,

20   "Randy has just been chasing with me since April and I have known him all my life we

21   [sic] used to run around as kids on the back-dirt roads of Missouri.  We have had a trust

22   that has grown between us and I think if I told him to drive into a lake he would."  On

23   September 30, 2016, Williamson wrote, "The hardest part is the navigating of the roads.

24   To be able to get where you want to be."  He described his education: "I am a self-taught

25   storm chaser.  I've learned everything I know on the internet – like YouTube training

26   videos and storm-related articles."  He continued, "I'm not a meteorologist.  I didn't go to

27   school for that."  When asked if he ever got frustrated when he could not get to a storm's

28   location fast enough, he stated, "Every time.  You just can't [get] there fast enough."

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

PLAINTIFF'S FIRST AMENDED COMPLAINT

1   When asked how he came to work for TWC, he stated, "Streaming my videos caught
2   their attention.  I had a good quality stream and they started buying it so over time I
3   ended up here!"  When asked about funding and equipment costs, Williamson wrote,
4   "Luckily I've got The Weather Channel to help equipment, but before I had to sell my
5   videos to afford anything.  It's about a week to get more equipment if you don't have
6   backup."  He continued, "The main cost is fuel for us.  We get 3 tanks a day sometimes."
7   On October 3, 2016, he wrote, "The Weather Channel purchases my fuel since I started
8   working for them."  When asked what his favorite job was, he responded, "What I'm
9   doing right now tracking storms for The Weather Channel man you can't beat that it's
10  great."

11      41.    TWC also purchased insurance policies on Williamson and Yarnall, as
12  indicated by Williamson in a live-streamed video taken less than two weeks before the
13  subject accident.   In "03-15-17 Tracking Lake Effect Snow" at 6:37:12, Williamson
14  explains why TWC did not allow fans to ride along with him and Yarnall during their
15  chases, stating, "Right now the insurance and that is just on me and Randy and
16  cameramen and stuff like that and it's all through The Weather Channel, so right now
17  there's some legal stuff that won't cover other people.  If a piece of hail hits you in the
18  head, they don't want to get sued."  Notably, two days before the subject accident in the
19  video "03-26-17 Tracking Storms in Okla and Texas", another storm chaser asked
20  Yarnall at 1:53:41 if he and Williamson are "with The Weather Channel" or "just
21  independent."  Yarnall replied, "We're with them.  We work for them."

22  *f.    TWC was aware the pair drove dangerously and the risk they posed to*
23  *others.*

24      42.    Importantly, TWC was fully aware of and had been warned by third parties
25  that their "STORM WRANGLERS" engaged in reckless driving before this tragedy.  In
26  one instance, another storm chaser, who had also been featured on TWC on multiple
27  occasions and knew Williamson and Yarnall personally, exchanged a series of text
28  messages with Kathryn Prociv ("Prociv"), a producer of the television show "STORM

19

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

PLAINTIFF'S FIRST AMENDED COMPLAINT

WRANGLERS" and meteorologist for TWC, concerning the dangerous nature of the driving habits of the "STORM WRANGLERS." On December 4, 2016 (approximately four months before the Subject Accident), this storm chaser texted Prociv: *"As far as Storm Wranglers: I understand the need and fact for 'dumbing down' for the general public. But I'm gonna be honest here (and I hope you take no offense at what I am going to say please... the fact of re matter is that you have 2 very inexperienced, new and uneducated 'chasers' .... talk about liability.  See where I am going with this?.... I'm not gonna badmouth Kelly but I'm not gonna lie either."*

43.    On March 4, 2017 (24 days before the Subject Accident), after nationally airing a segment that showed Williamson traveling over 90 mph to try to reach a storm, Prociv wrote the same storm chaser: *"So great to hear from you. Ugh frustrating for you and us! I forwarded some notes from your message to my boss Mike Chesterfield. Hopefully he gets back to me this upcoming week.  I'm not sure if you happened to catch any of Kelley's movements, but he put himself in a VERY bad spot, live on air, so god forbid if anything happened we would have seen it happen live on air.  NOT GOOD."* Mike Chesterfield was at the time of JAEGER'S death, and is currently, Director, Weather Presentation and an Executive Producer for and a managerial employee of TWC.

44.    Later that day (March 4, 2017), the storm chaser responded: *"Oh yeah, I saw it... I [message missing] "bad guy" but I'm going to be honest with you – it's only gonna get worse.  You and I both know that you absolutely cannot put yourself in a position like that... storm movements being so fast leaving little time to react and losing situational awareness simply due to inexperience.  Doing 90+mph to get to the position he was is just asking for bad stuff and showing or talking about it on his live stream.  I just hope he truly understands the risks associated.  The goal isn't to become part of the Weather story, it's to help tell the Weather story.  I know Randy [another chaser] tried to teach him some of these things in the past and I even tried to educate him privately before you all singed him.  But hey, we were all noobs at some point and learning... we*

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

20

PLAINTIFF'S FIRST AMENDED COMPLAINT

1  just didn't have a national audience on us at that time.  We are just hoping he doesn't

2  get hurt or hurt anyone else.  There is so much more I'd like to say but I don't want to get

3  involved."

4        45.    On March 29, 2017 (the day after the accident), Prociv and the same storm

5  chaser exchanged more messages. Prociv wrote: *"Of course I know what you mean!  I*

6  *want to be here for you, I do, and I'm more comfortable talking here than on the phone*

7  *where they could check my records if they really wanted to.  I'm mainly concerned with*

8  *how you're holding up. I don't blame you for calling off the chase.  It wouldn't have been*

9  *safe for you to chase today if your mind was consumed elsewhere."*

10       46.    The same day the storm chaser responded: *"Thank you.  I'm doing okay. I*

11 *mean you know that Kelley and I didn't have the relationship like Tim [storm chaser and*

12 *engineer killed in 2013 El Reno tornado] and I. But everything I told him about driving*

13 *safer and not being so distracted... and then telling you that I was worried that he was*

14 *gonna kill someone or himself... those are the exact messages I shared with you.  And*

15 *then it happens.  So I am obviously in a way dark place right now. I know many of us*

16 *are. I guess that's what killin me. I tried to tell him over and over.  And then when I saw*

17 *him yesterday near Paducah he pulls up and he was driving not Randy, I asked him why*

18 *he was driving and not doing the filming in a joking manner he just laughed.  We talked*

19 *about the storms and the day and then said our goodbyes and good lucks... he drove*

20 *off.  I remember thinking hope they are safe today…. And hope they have a good day.  I*

21 *don't know.  It's a rough day.  I shut my stream off and went south right after we chatted*

22 *and man... that was stupid.  It was bad."* Later, Prociv responded: *"Oh wow I didn't*

23 *realize you chatted with him yesterday before the storms started. I know you tried to*

24 *warn him and provide advice several times, so you did everything you could.  You really*

25 *did.  Please don't beat yourself up over it Lanny.  You're all heart and were looking out*

26 *for everyone's safety.  I'm glad you're headed home.  Try and get some much needed*

27 *rest."*

28       47.    Additional messages exchanged between other chasers further confirm the

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-3019
TELEPHONE 619-234-3913

21

1   warnings given to high managerial agents of TWC regarding Williamson's and Yarnall's

2   dangerous driving habits. Furthermore, Plaintiff is informed and believes and thereon

3   alleges that at least one individual received a potentially disturbing request from TWC

4   immediately after the accident. This individual, another storm chaser, was one of the first

5   to arrive at the scene of the Subject Accident, before even emergency personnel.  Upon

6   arrival, he immediately contacted TWC to notify them that one of their vehicles was

7   involved in the collision, which he easily deduced by virtue of the large TWC logo on the

8   Suburban.  He also recognized Williamson on the side of the road as he was being

9   administered CPR.  This witness immediately notified Jim Cantore, an extremely well

10  known, on-camera meteorologist and television personality for TWC.  Shortly after doing

11  so, while this witness was speaking to a police investigator at the scene, he received a

12  phone call from a woman who claimed to be affiliated with TWC. This woman told him,

13  "You've got to get the cameras.  Get the cameras."  The individual responded that he

14  would do no such thing and the call ended. However, minutes later, he received a

15  second phone call from a male subject who also claimed to be affiliated with TWC. This

16  male subject also told him, "Go get the cameras."  Moments later, another person at the

17  accident scene approached this individual and stated that he, too, had received a call

18  from TWC with instructions to grab the cameras. The individual told this person not to

19  take the cameras, as it was a crime scene.

20       48.    TWC's Storm Wranglers television show, Season 1, Episode 1, "One Epic

21  Day" aired nationally on The Weather Channel on October 2, 2016 (hereinafter "OED").

22  TWC's Storm Wranglers television show, Season 1, Episode 2, "A Tale of Four Storms"

23  aired nationally on The Weather Channel on October 9, 2016 (hereinafter "TFS").  Each

24  episode demonstrates the level of the involvement that TWC had in the production of its

25  television show and in encouragement of "the chase" of severe storms and in the filming

26  of the recklessness of its employee storm chasers Williamson and Yarnall.  The first two

27  episodes were shot in Texas, Kansas and parts of Oklahoma.  The trailing credits set

28  forth the names of those involved at TWC in the production of Storm Wranglers.  In

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

PLAINTIFF'S FIRST AMENDED COMPLAINT

1  addition to Williamson and Yarnall, during the filming, TWC had placed in the vehicle
2  being used by its stars one of three photographers, Michael Fomil, Bradley Reynolds
3  and Rodney Hall, employees of TWC and witnesses to Yarnall's driving.  The camera
4  equipment being used was TWC equipment.  The episodes OED and TFS that aired
5  show the involvement of TWC television personalities Chris Warren, Carl Parker, Dr.
6  Greg Forbes and Assistant Desk Editor Ryan Sloane, the latter of whom is dubbed by
7  Williamson as "Hash".  The episodes demonstrate the interface and interactions by and
8  between TWC and its broadcast studio named "The Lab" and Williamson and Yarnall,
9  demonstrating, as stated on air by TWC's Chris Warren, that they can monitor and watch
10  the video feed live being broadcast by Williamson and Yarnall and cut to that live and put
11  what is occurring in the field immediately on the national broadcast by simply raising his
12  hand and cutting to that feed.  See, OED 3:25-3:58.  Graphics used by TWC in the show
13  explain the activity of Williamson and Yarnall in the field, showing live broadcasting from
14  the vehicle they were operating (OED 10:13; 14:50; 32:46 [the latter showing Yarnall
15  driving while talking on his cell phone] TFS 16:10; 26:10; 28:51; 31:17; 34:35; 35:10;
16  40:39).  The episodes are replete with the "egging on" by Williamson to his driver Yarnall
17  to "go, go, go" and "push it" and Yarnall's response "I've got it to the floor."  The episode
18  demonstrates these storm chasers acting as first responders calling 911 to report
19  tornadoes and representing on the air "yes, this is Kelly Williamson, I'm with the Weather
20  Channel". (OED 6:50).

21       49.  The fact that TWC was monitoring and directing its employees in the field
22  is also evident in these episodes.  At TFS at 21:54, Ryan Sloane, aka "Hash", is on the
23  air from TWC's production room and he is instructing Williamson and Yarnall to "head
24  west" and "hang around the Texas panhandle" and "head to Amarillo."  That same
25  individual, who appears many times on the national broadcast, tells Williamson to "call it"
26  for the day and "breaking it down for the day" (TFS at 28:51).  The bravado of TWC,
27  Williamson and Yarnall are also demonstrated in these two episodes and the out and out
28  actual boasting, touting and braggart of Williamson and Yarnall knowingly breaking the

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

23

PLAINTIFF'S FIRST AMENDED COMPLAINT

1  law is also evident.  Williamson states in the program that "Randy would go anywhere I
2  tell him to go, ask him to go, anywhere I ask him to go." (TFS at 31:10).  Williamson
3  states in Episode 1 that "Randy would drive through a brick wall if I told him to." (OED at
4  13:37).  Williamson is interviewed by TWC for inclusion in the episode One Epic Day
5  claiming that Yarnall "just goes where I say to go" and the very next scene edited into the
6  program by TWC's staffing shows Williamson and Yarnall sitting at a red light when
7  Williamson says to him "clean, go" and Yarnall drives through the red light (OED at
8  26:28-27:30).  TWC's own editors found, edited and used video tape feed that supports
9  Williamson's claims that Yarnall will drive through a brick wall, go wherever he tells
10 Yarnall to go and do whatever he tells Yarnall to do, demonstrating that by showing
11 Williamson having Yarnall drive through a red light right after a truck drives through the
12 intersection from right to left in front of them.  Once, when Williamson states "just lay it
13 on" and "get on it" and Yarnall responds "tell me what to do" and "I can't see", Williamson
14 states "That's ok" (OED at 35:50).

15        50.     TWC had actual knowledge of the poor driving habits of these individuals,
16 to the extent that it was apparent it was more likely Williamson and Yarnall would run a
17 stop sign than stop at a stop sign.  And Yarnall ran a stop sign killing JAEGER.  TWC
18 knew Williamson and Yarnall drove at unsafe speeds (Williamson states "sometimes we
19 might be going faster than we should be going" [TFS at 30:55]).  TWC knew storm
20 chasing was dangerous (TWC's Dr. Greg Forbes, "storm chasing is dangerous", OED at
21 34:00).  TWC production and editing personnel as well as its on-air personnel had direct
22 link access to what Williamson and Yarnall were seeing and taping.  Much footage from
23 Williamson's YouTube video feeds ended up in Episodes 1 and 2.  TWC had the
24 opportunity to pull these two individuals off the road or hire a competent, law abiding
25 driver.  Instead, TWC made Williamson and Yarnall television stars, breaking laws,
26 driving on private property (TFS at 38:30), driving off road, in ditches, through hail
27 storms, drive the wrong way on freeway ramps, on the wrong side of the roadway,
28 through red lights and stop signs, all to increase the sense of danger to their television

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

24

PLAINTIFF'S FIRST AMENDED COMPLAINT

1  audience and sell advertising and have a hit show.  The result was the death of young

2  JAEGER.

### VI.

### CAUSES OF ACTION

### COUNT ONE:

### NEGLIGENCE AND GROSS NEGLIGENCE

7      51.    Plaintiff re-alleges and incorporates by reference each of the allegations

8  set forth in the preceding paragraphs as if set forth fully and reiterated here in their

9  entirety.

10     52.    Accordingly, by their actions described herein, all of the Defendants were

11  negligent, grossly negligent and/or acted with malice in at least the following regards:

12          a.    TWC Defendants proximately caused the Subject Accident

13                and the death of JAEGER by operating a motor vehicle in

14                violation of Texas Transportation Code §544.010 (failure to stop

15                at stop sign);

16          b.    TWC Defendants proximately caused the Subject Accident

17                and the death of JAEGER by operating a motor vehicle in

18                violation of Texas Transportation Code §544.351 (failure to

19                drive at a speed that was reasonable and prudent under the

20                existing circumstances);

21          c.    Williamson and Yarnall proximately caused the Subject Accident

22                and the death of JAEGER by operating a motor vehicle with a

23                dangerously obstructed windshield;

24          d.    Williamson and Yarnall were acting within the course and scope

25                of their employment and/or agency with TWC when the acts which

26                proximately caused the death of JAEGER alleged herein occurred;

27          e.    TWC authorized, controlled, managed, encouraged and promoted

28                the dangerous operation of a mobile live feed studio by their

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

25

PLAINTIFF'S FIRST AMENDED COMPLAINT

employees and/or agents, Williamson and Yarnall, inclusive of encouraging and promoting the dangerous operation of the Suburban in the filming and capturing of footage for both storm chasing as well as for the "STORM WRANGLERS" television show;

f.     High managerial agents of TWC, acting within their scope of office and/or employment, authorized, requested, commanded, performed, and/or recklessly tolerated and ignored the dangerous driving behavior of Yarnall and Williamson without regard for the safety of others; and

g.     TWC consciously and recklessly employed, promoted, managed and controlled two amateur storm chasers without sufficient training, supervision or experience to operate a mobile live feed broadcasting studio on public roadways during extreme weather events.

53.     Defendants' conduct described above constitutes gross negligence, recklessness, and/or intentional misconduct.

**COUNT TWO:**

**WRONGFUL DEATH**

54.     Plaintiff re-alleges and incorporates by reference each of the allegations set forth in the preceding paragraphs as if set forth fully and reiterated here in their entirety.

55.     Plaintiff brings this wrongful death claim against Defendants pursuant to Texas Civil Practice & Remedies Code sections 71.001-71.012.

56.     Plaintiff is a statutory beneficiary of JAEGER and relied on him for love, affection, comfort, protection and care.

57.     Plaintiff is the executor/administrator/representative of the Estate of CORBIN JAEGER.

58.     Defendants' wrongful acts caused the death of JAEGER.

59.     JAEGER would have been entitled to bring an action for his injuries had he

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

PLAINTIFF'S FIRST AMENDED COMPLAINT

1  lived.

2      60.    As a proximate result of Defendants' conduct, which caused the untimely

3  death of JAEGER, Plaintiff is entitled to recover, in excess of the minimum jurisdictional

4  limits of this Court.

5                          **COUNT THREE:**

6                          **SURVIVAL ACTION**

7      61.    Plaintiff re-alleges and incorporates by reference each of the allegations

8  set forth in the preceding paragraphs as if set forth fully and reiterated here in their

9  entirety.

10     62.    Plaintiff brings this survival action claim against Defendants pursuant to

11  Texas Civil Practice & Remedies Code sections 71.021-71.022.

12     63.    Plaintiff is the legal representative of the Estate of CORBIN LEE JAEGER.

13  Prior to his death, JAEGER had a survival action for himself for the pain and suffering

14  and expenses JAEGER sustained prior to his death. Plaintiff is appearing in the survival

15  action as the legal representative of the Estate of CORBIN LEE JAEGER.

16     64.    Defendants' wrongful acts led to JAEGER's death.

17     65.    As a proximate result of Defendants' conduct, which led to the untimely

18  death of JAEGER, Plaintiff on behalf of the Estate of CORBIN LEE JAEGER, deceased,

19  is entitled to recover, in excess of the minimum jurisdictional limits of this Court.

20                     **DAMAGES – ALL DEFENDANTS**

21     66.    Defendants' acts and/or omissions were the proximate cause of the

22  following injuries suffered by Plaintiff and decedent:

23         a.    Actual damages of not less than One Hundred Twenty-Five Million

24              Dollars and No Cents ($125,000,000.00);

25         b.    Loss of affection, consortium, comfort, protection and care;

26         c.    Pain and suffering and mental anguish suffered by JAEGER

27              prior to his death;

28         d.    Mental anguish and emotional distress suffered by Plaintiff;

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

27

PLAINTIFF'S FIRST AMENDED COMPLAINT

    e.    Loss of quality of life;

    f.    Funeral and burial expenses;

    g.    Loss of service;

    h.    Exemplary and punitive damages as well as reasonable attorneys' fees authorized by law and costs of court;

    i.    Prejudgment interest; and

    j.    Post judgment interest.

67.    Plaintiff seeks un-liquidated damages in an amount that is within the jurisdictional limits of the court.

## CONDITIONS PRECEDENT

68.    Defendants have actual notice of JAEGER's death and injuries complained of herein. Any conditions precedent have occurred, been performed, or have been waived.

## DEMAND FOR JURY

69.    Plaintiff hereby makes a demand for a jury trial.

## PRAYER

Wherefore, Plaintiff prays that Defendants be cited to appear and answer herein and, upon final trial hereof, that Plaintiff recovers from Defendants not less than One Hundred Twenty-Five Million Dollars and No Cents ($125,000,000.00) in actual damages, exemplary damages, pre-judgment and post-judgment interest, costs of court, attorneys' fees all as authorized by law, and such other and further relief, both general and special, at law and in equity, to which they may be justly entitled.

///

///

///

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

28

PLAINTIFF'S FIRST AMENDED COMPLAINT

DATED:  April 8, 2019

LAW OFFICES OF ROBERT A. BALL

By:

ROBERT A. BALL, SBN (CA) 00761
JOHN M. DONNELLY, SBN (CA) 156965
ADMITTED *PRO HAC VICE*
Plaintiffs KAREN DI PIAZZA,
Individually and as Natural Mother to CORBIN JAEGER and as
Executor/Administrator/Representative of the
Estate of CORBIN JAEGER, DECEASED
225 Broadway, Suite 2220
San Diego, Califorina 92101
Telephone (619) 234-3913; Fax (619) 234-4055
rball@robertballapc.com
jdonnelly@robertballapc.com

DATED:  April 8, 2019

MCCLESKEY HARRIGER BRAZILL & GRAF LLP

By:

BENJAMIN H. DAVIDSON, II, SBN 05430590
MARY KATHLEEN DAVIDSON, SBN 24070919
Plaintiffs KAREN DI PIAZZA,
Individually and as Natural Mother to CORBIN JAEGER and as
Executor/Administrator/Representative of the
Estate of CORBIN JAEGER, DECEASED
5010 University Avenue, 5th Floor
Lubbock, Texas 79413
Telephone (806) 796-7306; Fax (806) 796-7365
bdavidson@mhbg.com
kdavidson@mhbg.com

LAW OFFICES OF
ROBERT A. BALL
225 Broadway, suite 2200
San Diego, CA 92101-5019
Telephone 619 234 3913

29

PLAINTIFF'S FIRST AMENDED COMPLAINT