**FILED**

**October 02, 2019**

KAREN MITCHELL
CLERK, U.S. DISTRICT COURT

1  Robert A. Ball, California Bar No. 70061
   John M. Donnelly, California Bar No. 156965
2  LAW OFFICES OF ROBERT A. BALL
   225 Broadway, Suite 2220
3  San Diego, California 92101
   Telephone: (619) 234-3913; Facsimile: (619) 234-4055
4  Email: rball@robertballapc.com, jdonnelly@robertballapc.com

5  Benjamin H. Davidson, II, State Bar No. 05430590
   Mary Kathleen Davidson, State Bar No. 24070919
6  McCLESKEY HARRIGER BRAZILL & GRAF LLP
   5010 University Avenue, Suite 500
7  Lubbock, Texas 79413
   Telephone: (806) 796-7306; Facsimile: (806) 796-7365
8  Email: bdavidson@mhbg.com, kdavidson@mhbg.com

9  Attorneys for: Plaintiffs KAREN DI PIAZZA,
   Individually and as Mother to CORBIN JAEGER and as Personal
10 Representative of the Estate of CORBIN LEE JAEGER, Deceased

11                **UNITED STATES DISTRICT COURT**

12          **NORTHERN DISTRICT OF TEXAS, LUBBOCK DIVISION**

13  KAREN DI PIAZZA, Individually and As      **PLAINTIFF'S THIRD AMENDED**
    Mother to CORBIN JAEGER and As            **COMPLAINT**
14  Personal Representative of the Estate of
15  CORBIN LEE JAEGER, Deceased,              **CASE NO. 5-19CV0060-C**

16                  Plaintiff,

17  v.

18  WEATHER GROUP TELEVISION, LLC
    dba THE WEATHER CHANNEL, a
19  Georgia limited liability company;
    WEATHER GROUP, LLC, a Delaware
20  limited liability company; CF
    ENTERTAINMENT, INC. dba
21  ENTERTAINMENT STUDIOS, a California
    corporation; ENTERTAINMENT STUDIOS
22  NETWORKS, INC., a California
    corporation; ENTERTAINMENT STUDIOS
23  MEDIA, INC., a California corporation;
    ENTERTAINMENT STUDIOS MEDIA
24  HOLDINGS, INC., a Delaware corporation;
    NBCUNIVERSAL MEDIA, LLC, a
25  Delaware limited liability company; BAIN
    CAPITAL INVESTORS, LLC, a Delaware
26  limited liability company; THE
    BLACKSTONE GROUP, INC., a Delaware
27  corporation; TV HOLDINGS 1, LLC, a
    Delaware limited liability company; TV
28  HOLDINGS 2, LLC, a Delaware limited

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

1
PLAINTIFF'S THIRD AMENDED COMPLAINT

1  liability company; TV SPINCO LLC, a
   Delaware limited liability company;
2  SHEENA BITTLE as Personal
   Representative of the Estate of KELLEY
3  GENE WILLIAMSON; KEITH DANIELS as
   Personal Representative of the Estate of
4  RANDALL D. YARNALL,

5                         Defendants.

6

7              **PLAINTIFF'S THIRD AMENDED COMPLAINT**

8          TO THE HONORABLE UNITED STATES DISTRICT COURT:

9          COMES NOW KAREN DI PIAZZA, Individually and as Mother to CORBIN

10  JAEGER, as Personal Representative of the Estate of CORBIN LEE JAEGER, Deceased

11  ("Plaintiff") and on behalf and for the benefit of all parties entitled to bring such causes of

12  action for the death of CORBIN LEE JAEGER, complaining of WEATHER GROUP

13  TELEVISION, LLC dba THE WEATHER CHANNEL ("Weather Channel"); WEATHER

14  GROUP, LLC ("Weather Group") (Weather Channel and Weather Group will hereafter be

15  collectively referred to as "TWC"); SHEENA BITTLE as Personal Representative of the

16  Estate of KELLEY GENE WILLIAMSON ("ESTATE OF WILLIAMSON"); KEITH DANIELS

17  as Personal Representative of the Estate of RANDALL D. YARNALL ("ESTATE OF

18  YARNALL") (all named Defendants above shall hereafter be collectively referred to as

19  "TWC Defendants"), with this Second Amended Complaint alleges as follows:

20                                     **I.**

21                   **NATURE AND PURPOSE OF THE ACTION**

22          1.     This action is brought by the heir and Estate of CORBIN LEE JAEGER

23  (DOB-6/11/91) ("JAEGER") who was killed in a horrific two-vehicle collision outside the

24  town of Spur, Texas on March 28, 2017. JAEGER was killed when a Chevrolet Suburban

25  SUV, Missouri License Plate Number 7SY297 ("Suburban"), driven by Randall Yarnall

26  ("Yarnall") and occupied by Kelley Gene Williamson ("Williamson") ran a stop sign at

27  seventy (70) miles per hour while racing towards a tornado to film that tornado on behalf

28  of TWC and collided with JAEGER'S vehicle, a 2012 Jeep Patriot ("Jeep"), while the Jeep

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

2

PLAINTIFF'S THIRD AMENDED COMPLAINT

had the right of way on westbound FM2794. The accident occurred approximately 55 miles southeast of Lubbock and 5 miles west of the town of Spur, in Dickens County, Texas, at the intersection of FM 2794 and County Road 419, the latter also known as Farm to Market Road 1081 ("FM 1081") (all collectively, the "Subject Accident").

2.      Yarnall and Williamson, who also died in the collision, were in the course and scope of their employment as storm chasers and television personalities with TWC when their Suburban ran the stop sign on northbound FM 1081. Plaintiff alleges that the Suburban, which was filled with broadcasting, radar and other storm chasing equipment, was being operated by and for the benefit of TWC as a mobile broadcasting studio and to film severe weather and to collect film footage for the TWC show "STORM WRANGLERS, SEASON 2," which television show starred Williamson and Yarnall as storm chasers, inclusive of chasing tornados across the United States, when it collided with the Jeep being driven by JAEGER. Furthermore, Yarnall and Williamson had a history of reckless driving when storm chasing and when filming TWC's television programming, which was well known among other storm chasers and TWC.  TWC was aware of this history because it: (1) had been warned by other storm chasers on several occasions before the Subject Accident that Yarnall and Williamson's driving put others at risk; and (2) had witnessed the pair's dangerous driving during live video feeds of their storm chasing, which was broadcast to TWC's studio and in the editing of its television program, STORM WRANGLERS. However, despite this knowledge of the risk posed by their employees/agents**,** TWC continued to allow Yarnall and Williamson to work as on-air storm chasers and to record footage of "the chase" and of storms to be used in the "STORM WRANGLERS" television program, which ultimately led to JAEGER'S tragic and completely avoidable demise.

3.      Plaintiff brings these wrongful death and survivor claims under Texas Civil Practice & Remedies Code sections 71.002 and 71.021 on behalf of herself as well as for the benefit of all beneficiaries entitled to bring this action pursuant to Texas Civil Practice & Remedies Code section 71.004, to recover damages for the death of JAEGER, which

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

3

PLAINTIFF'S THIRD AMENDED COMPLAINT

1    were directly and proximately caused by the acts and omissions of Defendants.

2                                         II.

3                         JURISDICTION AND VENUE

4        4.     This court has original jurisdiction over this action pursuant to 28 U.S.C. §

5    1332 in that the controversy exceeds the sum or value of $75,000, exclusive of interest

6    and costs, and is between citizens of different States.

7        5.     Venue is appropriate in the United States District Court; Northern District of

8    Texas, Lubbock Division, since the town of Spur, in Dickens County, Texas was the

9    location of the Subject Accident that is the basis of the causes of action set forth herein.

10                                        III.

11                                      PARTIES

12       6.     Plaintiff KAREN DI PIAZZA ("Plaintiff") resides in Glendale, Arizona, is a

13   citizen of the State of Arizona, and is the mother of the decedent, JAEGER, who was also

14   a resident of and domiciled in the state of Arizona at the time of his death. Plaintiff is also

15   the Personal Representative of the Estate of CORBIN LEE JAEGER.  The Estate of

16   CORBIN LEE JAEGER is being administered in the Superior Court of Arizona, County of

17   Maricopa, the case titled *In the Matter of the Estate of Corbin Lee Jaeger, Deceased*, Case

18   No. PB 2018-001588.

19       7.     Defendant WEATHER GROUP TELEVISION, LLC dba THE WEATHER

20   CHANNEL, is a Georgia limited liability company ("Weather Channel") having its principal

21   place of business located at 300 Interstate North Parkway SE, Atlanta, GA 30339.

22   Weather Channel's sole member is defendant WEATHER GROUP, LLC, a Delaware

23   limited liability company ("Weather Group"). Weather Group's sole members are

24   defendants TV HOLDINGS 1, LLC ("TV1") and TV HOLDINGS 2, LLC ("TV2"). TV1's sole

25   member is Byron Allen Folks ("FOLKS"), an individual, who is a citizen of the State of

26   California. TV2's sole member is also FOLKS. This Defendant has been served with

27   process and has filed an answer. Plaintiff is informed and believes, and thereon alleges,

28   that Williamson and Yarnall were the employees and/or agents of the Weather Channel

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

4

PLAINTIFF'S THIRD AMENDED COMPLAINT

1  and were acting within the course and scope of that employment and/or agency at all times

2  alleged herein.

3       8.    Defendant Weather Group, LLC is a Delaware limited liability company

4  having its principal place of business located at 300 Interstate North Parkway SE, Atlanta,

5  GA 30339. Weather Group's sole members are TV1 and TV2, whose sole member is

6  FOLKS, who is a citizen of the State of California. This Defendant has been served with

7  process and has filed an answer. Plaintiff is informed and believes, and thereon alleges,

8  that Williamson and Yarnall were the employees and/or agents of Weather Group, LLC

9  and were acting within the course and scope of that employment and/or agency at all times

10  alleged herein. [1]

11       9.    Reserved.

12       10.   Reserved.

13       11.   Reserved.

14       12.   Reserved.

15       13.   Reserved.

16       14.   Reserved.

17       15.   Reserved.

18       16.   Reserved.

19       17.   Reserved.

20       18.   Reserved.

---

[1] On September 9, 2019, previously named Defendants CF ENTERTAINMENT, INC. dba ENTERTAINMENT STUDIOS, a California corporation; ENTERTAINMENT STUDIOS NETWORKS, INC., a California corporation; ENTERTAINMENT STUDIOS MEDIA, INC., a California corporation; ENTERTAINMENT STUDIOS MEDIA HOLDINGS, INC., a Delaware corporation; NBCUNIVERSAL MEDIA, LLC, a Delaware limited liability company; BAIN CAPITAL INVESTORS, LLC, a Delaware limited liability company; THE BLACKSTONE GROUP, INC., a Delaware corporation; TV HOLDINGS 1, LLC, a Delaware limited liability company; TV HOLDINGS 2, LLC, a Delaware limited liability company; and TV SPINCO LLC, a Delaware limited liability company (collectively "Out of State Defendants") were ordered dismissed without prejudice by the Court following a Motion to Dismiss for Lack of Specific Jurisdiction ("Motion") filed by the Out of State Defendants (Document No. 106). Accordingly, Plaintiff has removed any reference to the Out of State Defendants from this Third Amended Complaint. Notwithstanding, Plaintiff reserves, and does not waive, the right to seek appellate review of the Court's ruling on the Motion and/or to seek leave to rename any and/or all of the dismissed Out of State Defendants in these proceedings if additional evidence is uncovered, which would warrant renaming any and/or all of these previously dismissed Out of State Defendants.

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

5

PLAINTIFF'S THIRD AMENDED COMPLAINT

19.     Defendant SHEENA BITTLE, a citizen of the State of Missouri, is the Personal Representative of the Estate of KELLEY GENE WILLIAMSON ("ESTATE OF WILLIAMSON"). This Defendant was served with process. This Defendant's Motion to Dismiss and Motion for a More Definite Statement was granted in part and denied in part. The ESTATE OF WILLIAMSON is being administered in the Barry County Circuit Court, state of Missouri, entitled *In re the Estate of Kelly Gene Williamson*, Case No. 17BR-PR00069.

20.     Defendant KEITH DANIELS, a citizen of the State of Missouri, is the Personal Representative of the Estate of RANDALL D. YARNALL ("ESTATE OF YARNALL"). This Defendant was served with process and has filed an answer. The ESTATE OF YARNALL is being administered in the Barry County Circuit Court, state of Missouri, entitled *In re the Estate of Randall D. Yarnall, Deceased*, Case No. 18BR-PR00052.

21.     Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, one or more and/or each of the TWC Defendants named herein, was and now is engaged in a joint enterprise with the remaining TWC Defendants, and was and now is the principal, agent, servant, employee, assignee, joint venturer, predecessor-in-interest, successor-in-interest, aider and abettor, and/or co-conspirator of each TWC Defendant, and in doing the things hereinafter alleged, were acting in the course and scope of their joint enterprise and authority as principals, agents, servants, employees, assignees, joint venturers, predecessors-in-interest, successors-in-interest, and/or co-conspirators and in the furtherance of such relationships, and with the full knowledge, acquiescence, authorization, permission and consent of their Co-defendants, as principals, and at their direction, instance and request. Each of the TWC Defendants was and is a party to an agreement, express and/or implied, with the remaining TWC Defendants for a common purpose to be carried out by all of the TWC Defendants. Each of the TWC Defendants also shared a community of pecuniary interest in that common purpose with each of the remaining TWC Defendants, and each of the TWC Defendants had an equal right to a

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

PLAINTIFF'S THIRD AMENDED COMPLAINT

voice in the direction of this common purpose and/or enterprise, which gave each of the TWC Defendants an equal right of control in this common purpose and/or enterprise. More specifically, as alleged herein, TWC Defendants agreed to share a community of interest with each and one another and were intricately involved in the common purposes/joint enterprises of storm chasing, filming extreme weather conditions and in reality television programming through the national broadcasting of their collective body of work for which TWC Defendants shared a community of pecuniary interest in the form of huge benefits and compensation through salaries, payment of expenses, branding, good will, advertisements and/or the airing of commercials.  Plaintiff is informed and believes that TWC programming is received and viewed in approximately 80 million households in the United States and TWC broadcasts approximately 90 hours of live content weekly (*See*, Nielsen's June 2018 Universe Estimate). Plaintiff is further informed and believes and thereon alleges that each such TWC Defendant committed, participated in, partnered, approved, consented to, ratified, authorized, directed, controlled and/or performed the acts, omissions, transactions and occurrences which constitute the common purposes/ joint enterprises of storm chasing, filming extreme weather conditions and reality television programming, which resulted in the Subject Accident that gave rise to this action.

22.     Plaintiff is informed, believes, and based thereon alleges that at all times herein mentioned, each of the TWC Defendants, was the alter ego of each other TWC Defendant.  There is such a unity of interest and control between and among the TWC Defendants, and each other, that their separate identities have ceased to exist, or never did exist.  To treat each entity Defendant as separate entities would perpetuate a fraud or result in gross injustice.

23.     Reserved.

24.     Reserved.

25.     [RESERVED].

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

7

PLAINTIFF'S THIRD AMENDED COMPLAINT

# IV.

# CHOICE OF LAW

26.    Plaintiff alleges a conflict exists between the substantive law of Texas and Arizona, Plaintiff's domicile, with respect to the following germane issues: (1) comparative fault; (2) Plaintiff's right to recover exemplary damages under **COUNT TWO** alleged herein; and (3) the amount of exemplary damages potentially available to Plaintiff under **COUNT I, COUNT II** and **COUNT III** alleged herein**.** Plaintiff requests the Court apply Arizona law as to these issues as opposed to Texas law to fully compensate Plaintiff (*see*, *Sulak v. American Eurocopter Corp.,* 901 F.Supp.2d 834 (N.D. Texas 2012). As to comparative fault, Plaintiff requests the Court apply Ariz. Rev. Stat. § 12-2505 (in conflict with Tex. Civ. Prac. & Rem. Code Ann. § 33.001). As to Plaintiff's right to recover exemplary damages under **COUNT II** for the wrongful death of her adult son, JAEGER, Plaintiff requests the Court apply Ariz. Rev. Stat. § 12-613 [*see also, Quinonez v. Anderson,* 144 Ariz. 193, 696 P.2d 1342 (Ariz. Ct. App. 1984)] [in conflict with Tex. Const. art. 16, § 26; *General Chemical Corp. v. De La Lastra,* 852 S.W.2d 916, 923 (Tex. 1993)]. As to the amount of exemplary damages potentially available to Plaintiff under **COUNT I, COUNT II** and **COUNT III,** Plaintiff requests the Court apply Arizona substantive law, which does not recognize a fixed standard for the amount of punitive damages that may be assessed (in conflict with Tex. Civ. Prac. & Rem. Code Ann. § 41.008).

# V.

# FACTS PARTICULAR TO PLAINTIFF'S CLAIMS

*a.    Live stream video footage leading up to the collision.*

27.    Williamson and Yarnall were well-known storm chasers for TWC and stars of the TWC show "STORM WRANGLERS". According to Williamson's Facebook profile, Williamson started working at TWC on February 26, 2016, listing his occupation as "Storm Chaser at The Weather Channel, covering all weather events via Live Stream as it is happening." Plaintiff is informed and believes and thereon alleges that Yarnall became Williamson's driving partner on April 9, 2016. Plaintiff is further informed and believes and

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

thereon alleges that on or about the summer of 2016, Williamson and Yarnall were approached by TWC to star in a new television show ultimately named "STORM WRANGLERS" in which Williamson and Yarnall, among other job duties, would operate the Suburban to record video footage and as a mobile broadcasting studio to be used by TWC employees, to wit, video editors, producers and directors of TWC, to produce the television show "STORM WRANGLERS" for national broadcast. Williamson and Yarnall agreed to TWC's proposal shortly thereafter. Plaintiff is informed and believes, and thereon alleges that the TWC Defendants benefited financially from their work as storm chasers and on "STORM WRANGLERS." Williamson and Yarnall were paid, among other compensation, salaries and their expenses were reimbursed by TWC while TWC directly financially benefited from the broadcast of "Storm Wranglers" through the sale of advertising and through promotion of TWC itself. TWC's concept of the new show, modeled after David Chun's work on The Ultimate-Fighter (mixed martial arts cage fighting) a Fox Sports Network sporting television broadcast, was described by TWC's own employee, Mina Valizadeh, Direction and Motion Designer, who was responsible for concept development, storyboarding, design and animation of the TWC Storm Wrangler show package, as follows:  "Storm Wranglers is a long form show produced by the Weather Channel which presents the adventures of two Storm chasers from Texas: Kelly Williamson and Randy Arnold (sic).  The concept is introducing the storm wranglers as two heroes when they start the adventure of chasing a storm.  The combination of footage and high contrast illustrations are the general look and direction of the show.  The quick cuts between illustrative animation and real footage capture the heroic and urgent feeling of the show."  Further, Ms. Valizadeh states: "The concept is showing Kelley as the hero. The combination of footage and cutting into moving high contrast illustration of him and his environment will be the general look and direction.  The cuts and quick motion bring a sense of thrill for the adventure he will be going through.  Here is the inspiration link: http://davidychun.com/The -Ultimate Fighter."  TWC's concept of presenting storm chasing as an adventurous, thrilling sporting event and to make its two stars "heroes" resulted in

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

PLAINTIFF'S THIRD AMENDED COMPLAINT

the violent death of young JAEGER. TWC Defendants were operating TWC's mobile broadcasting studio (the Suburban) at approximately 70 miles per hour racing northbound on FM 1081 to film a tornado when it ran the stop sign at that speed at the intersection of FM 1081 and FM 2794 and struck the Jeep being operated by JAEGER, killing him. JAEGER was lawfully driving westbound on FM2794 and away from that tornado. JAEGER was pronounced dead at the scene by first responders and the Dickens County Coroner.

28.     Williamson and Yarnall were working in these capacities at the time of the collision.  More specifically, Williamson and Yarnall were engaged in the joint enterprise of tracking and filming severe weather and live-streaming the footage to Williamson's Facebook account and YouTube channel, as well as to TWC's Facebook account, at the moment the two vehicles collided when the Suburban driven by Yarnall ran the stop sign for its path of travel on Northbound FM 1081. At the time of the collision, and in addition to live-streaming the pair's video footage of that day, Williamson was also acting as spotter, navigator and monitor of the weather radar display installed in the Suburban while the pair attempted to locate and film severe weather (tornados) with the assistance of and/or the direction of TWC, which had appeared in the vicinity of Spur, Texas on behalf of their employer and/or principal, TWC.  The video Williamson live-streamed to his YouTube channel, "03-28-17 Tracking Storms in West Texas" ("Video"), contains this footage.  The duration of the Video is 2 hours, 28 minutes, and 21 seconds ("2:28:21"), and it showcases Williamson and Yarnall's travels throughout Texas that day. Due to lag between the audio and video, the Video freezes at 2:25:49, at the moment the Defendants approached the stop sign, immediately prior to the collision, at approximately 70 miles per hour. Defendants failed to stop at that stop sign causing the collision and killing JAEGER. The failure to stop at this stop sign was Defendants' fourth such traffic violation that day.

29.     Throughout the Video, the two can be heard speaking to their employers at TWC. At 2:13:30, Williamson tells the audience his stream is being shown on TWC's Facebook live.  At 2:17:00, Mr. Scott Thompson, Director of Newsgathering for TWC, calls

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

1   Williamson and speaks to him for over a minute.  At 2:21:02, a woman's voice says, "Hey
2   Kelley, they still have you up on The Weather Channel full screen."   At 2:21:16,
3   Defendants' radar spotter, Barry Gray, says, "Kelley, you're on The Weather Channel full
4   screen."  At 2:21:58, a contact listed in Williamson's phone as "TWC The Weather Cha…"
5   calls him; the conversation lasts until 2:25:19.  Williamson was streaming the day's footage
6   to TWC and had been in contact with TWC contemporaneously with the Subject Accident.

7        30.     The Video also showcases four other instances of Williamson and Yarnall
8   running stop signs, besides the one that led to the Subject Accident, at 1:05:10, 1:08:15,
9   2:03:27, and 2:06:08.  The running a stop sign incident at 2:03:27 occurs at the same
10  intersection where the Subject Accident occurred as Williamson and Yarnall travel
11  <u>southbound</u> on FM 1081.  At 2:25:49, they approach the intersection of the Subject
12  Accident for the last time, traveling <u>northbound</u> on FM 1081. Prior to that stop sign, four
13  signs indicate the approach of a stop-controlled intersection.  The first warning is a
14  "Highway Intersection Ahead" sign.  After this, a "JCT 2794 Farm Road" sign indicates the
15  approaching junction with FM 2794.  After this, there is a stop sign warning sign.  After
16  this, a sign indicates that the city of Spur is to the right, and White River Lake is to the left,
17  implying that these locations are accessible via FM 2794.  Finally, there is the stop sign,
18  itself.  The Video ends abruptly just before the collision, as the Suburban travels full-speed
19  towards the stop sign.  The warning signs, as well as the stop sign, itself, are all clearly
20  visible and unobstructed through the lens of the video equipment being used and deployed
21  by the TWC Defendants.  At this time, Defendants were attempting to track down and film
22  tornadoes in the region, and at the time of the Subject Accident it was raining.  It is believed
23  their speed at the time of driving through the stop sign and at impact with the Jeep was
24  approximately 70 miles per hour. Notably, no one from TWC mentions or refers to the
25  pair's blatant and repeated traffic violations during the Video.

26  **b.     The Suburban's windshield was dangerously obstructed.**

27        31.     While the stop sign before the intersection of the Subject Accident was
28  unobstructed, the windshield of the Suburban operated by Defendants was obstructed.

LAW OFFICES OF
ROBERT A. BALL
225 Broadway, suite 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

11

PLAINTIFF'S THIRD AMENDED COMPLAINT

Defendants had an array of expensive storm tracking and broadcast equipment, which Plaintiff is informed and believes and thereon alleges, was paid for and installed by TWC. This equipment dangerously limited Defendants' field of vision. Photos and video that Yarnall and Williamson uploaded to their respective social media accounts showcase the poor visibility they had from their positions in the Suburban. In a December 29, 2016 interview on the podcast "Storm Front Freaks," Williamson stated, "If anyone's ever seen [the Suburban], they wonder how I get in it.  I've got a pretty good-sized computer sitting here in front of me and one camera up in the windshield and then I've got another console here that I run a camera that's actually up on top of my vehicle.  Then I've got up on the dash a live view that I actually stream back to TWC with.  It's kind of like crawling into a cockpit.  There's not a lot of room."  In another live-stream broadcast uploaded to his YouTube channel two days before the subject accident titled "03-26-17 Tracking Storms in Okla and Texas", Williamson actually states at mark 13:09 on the stream, while speaking live with TWC, "A lot of times, you can see more in your camera lens than you can actually by eye, so I've actually got a screen in front of me that I pretty much watch and a lot of times I can see more on it than by looking out the windows."

32.     This equipment also dangerously obstructed the view of the Suburban's driver, Yarnall. A photograph depicting the driver's perspective from inside the Suburban taken about twenty minutes before the Subject Accident occurred shows Yarnall's cellphone mounted on the bottom left portion of the windshield, with a radar application open on the screen, showcasing the region's weather patterns. Thus, Yarnall, the designated driver, had access to, used and deployed, while driving, TWC equipment that distracted Yarnall in the operation of the Suburban and obstructed his view of the roadway.

***c.     Williamson and Yarnall were habitually reckless and dangerous.***

33.     The reckless and irresponsible driving employed by Williamson and Yarnall and TWC on the day of the Subject Accident was, unfortunately, not an aberration. To the contrary, it was the culmination of a long and well-documented history of dangerous behavior behind the wheel. In other videos on Williamson's YouTube channel, which

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

PLAINTIFF'S THIRD AMENDED COMPLAINT

showcase entire days of storm chasing, Williamson and Yarnall show time and again their disregard of basic traffic safety laws. In just fourteen (14) of these videos (a mere fraction of roughly 223 posted videos), the pair runs approximately eighty (80) stop signs, four (4) red lights, and one (1) out-of-service traffic light.  Williamson, who, along with TWC, at all relevant times alleged herein, including the day of the Subject Accident, directed Yarnall's driving while storm chasing can often be heard saying, "Clear," informing Yarnall that he (Yarnall) has the go-ahead to ignore the stop signal. Further, they frequently drove at high speeds in severe weather conditions and made dangerous, illegal passes of other cars, even with hail on the ground.  Williamson can sometimes be heard instructing Yarnall to make these maneuvers, as one example: "If you can, get around them." There are also numerous instances of the pair driving on the wrong side of the road, both by accident and by design.  Williamson also frequently encouraged Yarnall to drive more aggressively in order to get into better positions from which to film storms, especially when they were out of position or in the wrong town.  He often made comments like: "Go, go, go Randy.  This is something you don't get much.  Keep going"; "That way, straight ahead, just lay it on"; "Keep going, keep going Randy"; "Get on it, get on it, come on, get it up there.  Take it out of four-wheel drive"; "Fifty – not going fifty.  Crank it"; "Just go as hard as you can."  "Get back in it if you can."  "We're getting out of it."  "See if you can get in this one"; and "Gonna need to get up here as quick as we can.  Just do what you can do to get us up there." Williamson even joked about Yarnall's aggressive driving: "We're gonna be testing Randy's driving skills today"; "Yeah, I got Randy driving.  He's my nitrous tanks"; and "I could say you drove your ass off."

34.    Yarnall also made light of his own driving behavior. On October 8, 2016, Williamson posted a photo to his Facebook account of the Suburban, with TWC's logo on the rear passenger door, getting its transmission replaced, with the following caption: "'Just about has a new transmission' – at Jon Murdock Chevrolet Cadillac Mitsubishi."  An individual commented on the photo, implying that Yarnall's aggressive driving was the cause for the need of a new transmission: "Randy's hot rodding?"  Yarnall replied to the

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

post "Go go go lol [sic]."  On October 26, 2016, Yarnall made his Facebook profile picture a short, repeating video of a tornado.  The footage appears to have been shot from the driver's side window while the vehicle was in motion, as the driver's side mirror was closely visible in the video and one can see trailing traffic in that mirror.  An individual posted a comment asking, "What is the location?"  Yarnall replied, "That was the Dodge city one in may [sic].  Cell phone out the window."  Another individual commented on the same video: 'I remember thinking at the time "please lord, two hands on the wheel…"'  In response, Yarnall replied, "Lol."  It appears that Yarnall filmed the tornado with his cell phone being held and operated by his left hand out the driver's side window of the vehicle he was driving and then bragged about it on social media.  Further, in one of Williamson's storm chasing videos "02-28-17 Tracking Severe Storms in Missouri 2", taken one month prior to the subject accident, Williamson mentioned that TWC was following their live stream: "They're listening.  Scott [Thompson]'s listening."  Yarnall responded, "If you're listening, hang on.  I'm gonna have to do some offensive driving."  Roughly eight minutes later at 31:56, Yarnall and Williamson run a stop sign while turning left at an intersection as it hails.

### d.     TWC consistently monitored and directed Williamson and Yarnall.

35.     In-studio representatives of TWC closely monitored and controlled Williamson and Yarnall as Williamson live-streamed so that the in-studio, on-camera anchors could showcase his live-streams and interview him when he captured particularly exciting footage.  In a video "03-24-17 Tracking Storms in NE Texas" (50:37 duration), just four (4) days prior to the fatal collision, Williamson and Yarnall were parked, filming rain and clouds, while trying to determine their plan of action.  At 32:45, Williamson received a text from TWC and Williamson says, "They said they're listening to you reading the radar, Randy.  Are you talking to yourself?  This thing's turned up too high.  I think they can hear us think."  Yarnall had been muttering to himself under his breath while evaluating the storm's radar data, and someone at TWC texted Williamson to inform him that they could hear Yarnall doing so.  In another video from the same day, "03-24-17 Tracking Storms in NE Texas" (10:27:37 duration), Williamson went live on TWC with TWC's employee, Chris

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

Warren ("Warren") at 6:11:34. Towards the end of their live session, Warren states, "Alright, storm tracker Kelley Williamson. You keep an eye on the sky, and we'll keep an eye on your camera, and we will check back on you a little later." Warren then stated on-air that TWC would continue to watch Williamson's live-stream. Such occurrences are commonplace throughout the numerous videos posted by Williamson.

36.     These in-studio TWC representatives did more than monitor the pair's footage; they instructed Williamson and Yarnall to perform certain actions. For example, in the video "03-15-17 Tracking Lake Effect Snow" (6:47:15 duration), the pair decided to find a suitable location to pull over so that they could remove ice accumulated on the equipment mounted to the vehicle's roof. At 1:11:30, they pull into a car wash, and the camera is directed at a wall as Williamson removes the ice. Less than five minutes later at 1:16:18, Yarnall informs Williamson that TWC notified him via Facebook that he needed to move his camera to capture a better image than the wall in front of their vehicle. In response, Williamson promptly readjusted the camera to face outside of the car wash to capture the snowy weather conditions. It was not unusual for Williamson and Yarnall to receive such specific directives from TWC. In other videos, TWC informed them of the days they would be working and the days they would have off, as well as the locations to which they would be sent.

37.     In another video, "01-21-2017 Tracking Storms in Dixie Alley" (5:11:02 duration), TWC used the Suburban as a mobile broadcasting studio. In this footage shot near Hattiesburg Mississippi, Williamson and Yarnall transport two local residents injured by a tornado to a local hospital. In route, Williamson, Yarnall and TWC turn on the Suburban's onboard cameras and conduct an interview of the tornado victims, which was broadcast live nation-wide from the interior of the moving Suburban.

**e.     *TWC encouraged the pair's recklessness and set the stage for this tragedy.***

38.     TWC characterized and advertised Williamson and Yarnall's show "STORM WRANGLERS" as a dangerous enterprise. The name "STORM WRANGLERS" itself connotes rushing into harm's way, riding and wrestling storms. The "logo" for the "STORM

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

WRANGLERS" television show depicts Williamson and Yarnall roping a tornado.  Instead of using meteorologists experienced in the tracking of tornados, however, TWC knowingly chose two chicken farmers and cattle ranchers from Missouri without any emergency/first responder or meteorological training to star in their show. TWC then instructed and directed them to barrel into dangerous weather conditions to obtain footage, needlessly endangering local residents fleeing impending catastrophe and trained first responders.

39.    On September 29, 2016, TWC issued a press release: 'Network Announces "Storm Wranglers" Two-Week Event.'  The announcement stated, 'The Weather Channel will also [show] "Storm Wranglers," a special two-week event kicking off Sunday, October 9 at 9 p.m. EST.  Storm Tracker Kelley Williamson and partner Randy Yarnall go head-to-head with every storm imaginable including powerful tornadoes and supercell thunderstorms.  The Missourian duo truly love tracking storms in a down-home, authentic way.' It stated further, "[Williamson] has become the eyes and ears on the ground for the network when viewers need help the most." The article quoted Howard Sappington, identified as the Vice President of Programming for TWC, saying, 'Kelley in particular is such an interesting and passionate character, and we feel lucky to have him as part of our family.  We believe both "Storm Wranglers" and "Weather Gone Viral" will not only prove to be very exciting to audiences but deliver on our promise to viewers to return to our weather roots.'  TWC released the first episode of "STORM WRANGLERS" on October 2, 2016 and released the second episode on October 9, 2016.   Underneath the announcement, TWC described a "recently launched community platform, weloveweather.tv," which serves as a website for fans of TWC, operated by TWC.

40.    On weloveweather.tv, a post by "The Weather Channel Staff" on September 26, 2016 showcased an "Exclusive Preview of Storm Wranglers!"  Part of this promotion included an online question and answer session with Williamson, where he posted a short biography and answered questions.  On September 26, Williamson wrote, "In order to be a storm chaser you must: understand the dangers and know your vehicle and your limitations on muddy dirt roads."  He continued, "What makes me different from other storm

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

trackers: when I go chasing I go with the objective of streaming a tornado to the public or The Weather Channel.  If I could not stream I would not go."  He continued, "I am not a meteorologist and I'm not an actor but I love chasing tornadoes enough that I think it overcomes my weaknesses."  In a question about his partner Yarnall, he wrote, "Randy has just been chasing with me since April and I have known him all my life we [sic] used to run around as kids on the back-dirt roads of Missouri.  We have had a trust that has grown between us and I think if I told him to drive into a lake he would."  On September 30, 2016, Williamson wrote, "The hardest part is the navigating of the roads.  To be able to get where you want to be." He described his education: "I am a self-taught storm chaser. I've learned everything I know on the internet – like YouTube training videos and storm-related articles."  He continued, "I'm not a meteorologist.  I didn't go to school for that." When asked if he ever got frustrated when he could not get to a storm's location fast enough, he stated, "Every time.  You just can't [get] there fast enough."  When asked how he came to work for TWC, he stated, "Streaming my videos caught their attention.  I had a good quality stream and they started buying it so over time I ended up here!"  When asked about funding and equipment costs, Williamson wrote, "Luckily I've got The Weather Channel to help equipment, but before I had to sell my videos to afford anything.  It's about a week to get more equipment if you don't have backup."  He continued, "The main cost is fuel for us.  We get 3 tanks a day sometimes."  On October 3, 2016, he wrote, "The Weather Channel purchases my fuel since I started working for them."  When asked what his favorite job was, he responded, "What I'm doing right now tracking storms for The Weather Channel man you can't beat that it's great."

41.    TWC also purchased insurance policies on Williamson and Yarnall, as indicated by Williamson in a live-streamed video taken less than two weeks before the subject accident.  In "03-15-17 Tracking Lake Effect Snow" at 6:37:12, Williamson explains why TWC did not allow fans to ride along with him and Yarnall during their chases, stating, "Right now the insurance and that is just on me and Randy and cameramen and stuff like that and it's all through The Weather Channel, so right now there's some legal stuff that

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

won't cover other people.  If a piece of hail hits you in the head, they don't want to get sued."  Notably, two days before the subject accident in the video "03-26-17 Tracking Storms in Okla and Texas", another storm chaser asked Yarnall at 1:53:41 if he and Williamson are "with The Weather Channel" or "just independent."  Yarnall replied, "We're with them.  We work for them."

   *f.*      ***TWC was aware the pair drove dangerously and the risk they posed to others.***

   42.      Importantly, TWC was fully aware of and had been warned by third parties that their "STORM WRANGLERS" engaged in reckless driving before this tragedy.  In one instance, another storm chaser, who had also been featured on TWC on multiple occasions and knew Williamson and Yarnall personally, exchanged a series of text messages with Kathryn Prociv ("Prociv"), a producer of the television show "STORM WRANGLERS" and meteorologist for TWC, concerning the dangerous nature of the driving habits of the "STORM WRANGLERS." On December 4, 2016 (approximately four months before the Subject Accident), this storm chaser texted Prociv: *"As far as Storm Wranglers: I understand the need and fact for 'dumbing down' for the general public.  But I'm gonna be honest here (and I hope you take no offense at what I am going to say please… the fact of re matter is that you have 2 very inexperienced, new and uneducated 'chasers' …. talk about liability.  See where I am going with this?…. I'm not gonna badmouth Kelly but I'm not gonna lie either."*

   43.      On March 4, 2017 (24 days before the Subject Accident), after nationally airing a segment that showed Williamson traveling over 90 mph to try to reach a storm, Prociv wrote the same storm chaser: *"So great to hear from you. Ugh frustrating for you and us! I forwarded some notes from your message to my boss Mike Chesterfield. Hopefully he gets back to me this upcoming week.  I'm not sure if you happened to catch any of Kelley's movements, but he put himself in a VERY bad spot, live on air, so god forbid if anything happened we would have seen it happen live on air.  NOT GOOD."*  Mike Chesterfield was at the time of JAEGER'S death, and is currently, Director, Weather Presentation and an Executive Producer for and a managerial employee of TWC.

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

PLAINTIFF'S THIRD AMENDED COMPLAINT

44.     Later that day (March 4, 2017), the storm chaser responded: *"Oh yeah, I saw it… I [message missing] "bad guy" but I'm going to be honest with you – it's only gonna get worse.  You and I both know that you absolutely cannot put yourself in a position like that… storm movements being so fast leaving little time to react and losing situational awareness simply due to inexperience.  Doing 90+mph to get to the position he was is just asking for bad stuff and showing or talking about it on his live stream.  I just hope he truly understands the risks associated.  The goal isn't to become part of the Weather story, it's to help tell the Weather story.  I know Randy [another chaser] tried to teach him some of these things in the past and I even tried to educate him privately before you all singed him.  But hey, we were all noobs at some point and learning… we just didn't have a national audience on us at that time.  We are just hoping he doesn't get hurt or hurt anyone else.  There is so much more I'd like to say but I don't want to get involved."*

45.     On March 29, 2017 (the day after the accident), Prociv and the same storm chaser exchanged more messages. Prociv wrote: *"Of course I know what you mean!  I want to be here for you, I do, and I'm more comfortable talking here than on the phone where they could check my records if they really wanted to.  I'm mainly concerned with how you're holding up. I don't blame you for calling off the chase.  It wouldn't have been safe for you to chase today if your mind was consumed elsewhere."*

46.     The same day the storm chaser responded: *"Thank you.  I'm doing okay. I mean you know that Kelley and I didn't have the relationship like Tim [storm chaser and engineer killed in 2013 El Reno tornado] and I. But everything I told him about driving safer and not being so distracted… and then telling you that I was worried that he was gonna kill someone or himself… those are the exact messages I shared with you.  And then it happens.  So I am obviously in a way dark place right now. I know many of us are. I guess that's what killin me. I tried to tell him over and over.  And then when I saw him yesterday near Paducah he pulls up and he was driving not Randy, I asked him why he was driving and not doing the filming in a joking manner he just laughed.  We talked about the storms and the day and then said our goodbyes and good lucks… he drove off.  I remember*

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

PLAINTIFF'S THIRD AMENDED COMPLAINT

*thinking hope they are safe today…. And hope they have a good day. I don't know. It's a rough day. I shut my stream off and went south right after we chatted and man… that was stupid. It was bad."* Later, Prociv responded: *"Oh wow I didn't realize you chatted with him yesterday before the storms started. I know you tried to warn him and provide advice several times, so you did everything you could. You really did. Please don't beat yourself up over it Lanny. You're all heart and were looking out for everyone's safety. I'm glad you're headed home. Try and get some much needed rest."*

47.    Additional messages exchanged between other chasers further confirm the warnings given to high managerial agents of TWC regarding Williamson's and Yarnall's dangerous driving habits. Furthermore, Plaintiff is informed and believes and thereon alleges that at least one individual received a potentially disturbing request from TWC immediately after the accident. This individual, another storm chaser, was one of the first to arrive at the scene of the Subject Accident, before even emergency personnel. Upon arrival, he immediately contacted TWC to notify them that one of their vehicles was involved in the collision, which he easily deduced by virtue of the large TWC logo on the Suburban. He also recognized Williamson on the side of the road as he was being administered CPR. This witness immediately notified Jim Cantore, an extremely well known, on-camera meteorologist and television personality for TWC. Shortly after doing so, while this witness was speaking to a police investigator at the scene, he received a phone call from a woman who claimed to be affiliated with TWC. This woman told him, "You've got to get the cameras. Get the cameras." The individual responded that he would do no such thing and the call ended. However, minutes later, he received a second phone call from a male subject who also claimed to be affiliated with TWC. This male subject also told him, "Go get the cameras." Moments later, another person at the accident scene approached this individual and stated that he, too, had received a call from TWC with instructions to grab the cameras. The individual told this person not to take the cameras, as it was a crime scene.

48.    TWC's Storm Wranglers television show, Season 1, Episode 1, "One Epic

20

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

PLAINTIFF'S THIRD AMENDED COMPLAINT

Day" aired nationally on The Weather Channel on October 2, 2016 (hereinafter "OED").

TWC's Storm Wranglers television show, Season 1, Episode 2, "A Tale of Four Storms"

aired nationally on The Weather Channel on October 9, 2016 (hereinafter "TFS").  Each

episode demonstrates the level of the involvement that TWC had in the production of its

television show and in encouragement of "the chase" of severe storms and in the filming

of the recklessness of its employee storm chasers Williamson and Yarnall.  The first two

episodes were shot in Texas, Kansas and parts of Oklahoma.  The trailing credits set forth

the names of those involved at TWC in the production of Storm Wranglers.  In addition to

Williamson and Yarnall, during the filming, TWC had placed in the vehicle being used by

its stars one of three photographers, Michael Fomil, Bradley Reynolds and Rodney Hall,

employees of TWC and witnesses to Yarnall's driving.  The camera equipment being used

was TWC equipment.  The episodes OED and TFS that aired show the involvement of

TWC television personalities Chris Warren, Carl Parker, Dr. Greg Forbes and Assistant

Desk Editor Ryan Sloane, the latter of whom is dubbed by Williamson as "Hash".  The

episodes demonstrate the interface and interactions by and between TWC and its

broadcast studio named "The Lab" and Williamson and Yarnall, demonstrating, as stated

on air by TWC's Chris Warren, that they can monitor and watch the video feed live being

broadcast by Williamson and Yarnall and cut to that live and put what is occurring in the

field immediately on the national broadcast by simply raising his hand and cutting to that

feed.  See, OED 3:25-3:58.  Graphics used by TWC in the show explain the activity of

Williamson and Yarnall in the field, showing live broadcasting from the vehicle they were

operating (OED 10:13; 14:50; 32:46 [the latter showing Yarnall driving while talking on his

cell phone] TFS 16:10; 26:10; 28:51; 31:17; 34:35; 35:10; 40:39).  The episodes are

replete with the "egging on" by Williamson to his driver Yarnall to "go, go, go" and "push

it" and Yarnall's response "I've got it to the floor."  The episode demonstrates these storm

chasers acting as first responders calling 911 to report tornadoes and representing on the

air "yes, this is Kelly Williamson, I'm with the Weather Channel". (OED 6:50).

49.    The fact that TWC was monitoring and directing its employees in the field is

also evident in these episodes.  At TFS at 21:54, Ryan Sloane, aka "Hash", is on the air from TWC's production room and he is instructing Williamson and Yarnall to "head west" and "hang around the Texas panhandle" and "head to Amarillo."  That same individual, who appears many times on the national broadcast, tells Williamson to "call it" for the day and "breaking it down for the day" (TFS at 28:51).  The bravado of TWC, Williamson and Yarnall are also demonstrated in these two episodes and the out and out actual boasting, touting and braggart of Williamson and Yarnall knowingly breaking the law is also evident. Williamson states in the program that "Randy would go anywhere I tell him to go, ask him to go, anywhere I ask him to go." (TFS at 31:10).  Williamson states in Episode 1 that "Randy would drive through a brick wall if I told him to." (OED at 13:37).  Williamson is interviewed by TWC for inclusion in the episode One Epic Day claiming that Yarnall "just goes where I say to go" and the very next scene edited into the program by TWC's staffing shows Williamson and Yarnall sitting at a red light when Williamson says to him "clean, go" and Yarnall drives through the red light (OED at 26:28-27:30).  TWC's own editors found, edited and used video tape feed that supports Williamson's claims that Yarnall will drive through a brick wall, go wherever he tells Yarnall to go and do whatever he tells Yarnall to do, demonstrating that by showing Williamson having Yarnall drive through a red light right after a truck drives through the intersection from right to left in front of them. Once, when Williamson states "just lay it on" and "get on it" and Yarnall responds "tell me what to do" and "I can't see", Williamson states "That's ok" (OED at 35:50).

50.     TWC had actual knowledge of the poor driving habits of these individuals, to the extent that it was apparent it was more likely Williamson and Yarnall would run a stop sign than stop at a stop sign.  And Yarnall ran a stop sign killing JAEGER.  TWC knew Williamson and Yarnall drove at unsafe speeds (Williamson states "sometimes we might be going faster than we should be going" [TFS at 30:55]).  TWC knew storm chasing was dangerous (TWC's Dr. Greg Forbes, "storm chasing is dangerous", OED at 34:00).  TWC production and editing personnel as well as its on-air personnel had direct link access to what Williamson and Yarnall were seeing and taping.  Much footage from Williamson's

1  YouTube video feeds ended up in Episodes 1 and 2.  TWC had the opportunity to pull

2  these two individuals off the road or hire a competent, law abiding driver.  Instead, TWC

3  made Williamson and Yarnall television stars, breaking laws, driving on private property

4  (TFS at 38:30), driving off road, in ditches, through hail storms, drive the wrong way on

5  freeway ramps, on the wrong side of the roadway, through red lights and stop signs, all to

6  increase the sense of danger to their television audience and sell advertising and have a

7  hit show.  The result was the death of young JAEGER.

8                                         **VI.**

9                               **CAUSES OF ACTION**

10                               <u>**COUNT ONE:**</u>

11                    **NEGLIGENCE AND GROSS NEGLIGENCE**

12         51.    Plaintiff re-alleges and incorporates by reference each of the allegations set

13  forth in the preceding paragraphs as if set forth fully and reiterated here in their entirety.

14         52.    Accordingly, by their actions described herein, all of the Defendants were

15  negligent, grossly negligent and/or acted with malice in at least the following regards:

16              a.    TWC Defendants proximately caused the Subject Accident

17                   and the death of JAEGER by operating a motor vehicle in

18                   violation of Texas Transportation Code §544.010 (failure to stop

19                   at stop sign);

20              b.    TWC Defendants proximately caused the Subject Accident

21                   and the death of JAEGER by operating a motor vehicle in

22                   violation of Texas Transportation Code §544.351 (failure to

23                   drive at a speed that was reasonable and prudent under the

24                   existing circumstances);

25              c.    Williamson and Yarnall proximately caused the Subject Accident

26                   and the death of JAEGER by operating a motor vehicle with a

27                   dangerously obstructed windshield;

28              d.    Williamson and Yarnall were acting within the course and scope

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

23

PLAINTIFF'S THIRD AMENDED COMPLAINT

1    of their employment and/or agency with TWC when the acts which

2    proximately caused the death of JAEGER alleged herein occurred;

3    e.    TWC authorized, controlled, managed, encouraged and promoted

4    the dangerous operation of a mobile live feed studio by their

5    employees and/or agents, Williamson and Yarnall, inclusive of

6    encouraging and promoting the dangerous operation of the Suburban

7    in the filming and capturing of footage for both storm chasing as well

8    as for the "STORM WRANGLERS" television show;

9    f.    High managerial agents of TWC, acting within their scope of office

10   and/or employment, authorized, requested, commanded, performed,

11   and/or recklessly tolerated and ignored the dangerous driving

12   behavior of Yarnall and Williamson without regard for the safety of

13   others; and

14   g.    TWC consciously and recklessly employed, promoted, managed and

15   controlled two amateur storm chasers without sufficient training,

16   supervision or experience to operate a mobile live feed broadcasting

17   studio on public roadways during extreme weather events.

18       53.    Defendants' conduct described above constitutes gross negligence,

19   recklessness, and/or intentional misconduct.

20                                **COUNT TWO:**

21                            **WRONGFUL DEATH**

22       54.    Plaintiff re-alleges and incorporates by reference each of the allegations set

23   forth in the preceding paragraphs as if set forth fully and reiterated here in their entirety.

24       55.    Plaintiff brings this wrongful death claim against Defendants as a statutory

25   beneficiary and also brings this claim for the benefit of all beneficiaries entitled to bring

26   this action pursuant to Texas Civil Practice & Remedies Code sections 71.001-71.012.

27       56.    Plaintiff is a statutory beneficiary of JAEGER and relied on him for love,

28   affection, comfort, protection and care.

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

24

PLAINTIFF'S THIRD AMENDED COMPLAINT

57.     Plaintiff is the executor/administrator/representative of the Estate of CORBIN JAEGER.

58.     Defendants' wrongful acts caused the death of JAEGER.

59.     JAEGER would have been entitled to bring an action for his injuries had he lived.

60.     As a proximate result of Defendants' conduct, which caused the untimely death of JAEGER, Plaintiff is entitled to recover, in excess of the minimum jurisdictional limits of this Court.

## COUNT THREE:

## SURVIVAL ACTION

61.     Plaintiff re-alleges and incorporates by reference each of the allegations set forth in the preceding paragraphs as if set forth fully and reiterated here in their entirety.

62.     Plaintiff brings this survival action claim against Defendants pursuant to Texas Civil Practice & Remedies Code sections 71.021-71.022.

63.     Plaintiff is the legal representative of the Estate of CORBIN LEE JAEGER. Prior to his death, JAEGER had a survival action for himself for the pain and suffering and expenses JAEGER sustained prior to his death. Plaintiff is appearing in the survival action as the legal representative of the Estate of CORBIN LEE JAEGER.

64.     Defendants' wrongful acts led to JAEGER's death.

65.     As a proximate result of Defendants' conduct, which led to the untimely death of JAEGER, Plaintiff on behalf of the Estate of CORBIN LEE JAEGER, deceased, is entitled to recover, in excess of the minimum jurisdictional limits of this Court.

## DAMAGES – ALL DEFENDANTS

66.     Defendants' acts and/or omissions were the proximate cause of the following injuries suffered by Plaintiff and decedent:

> a.     Actual damages of not less than One Hundred Twenty-Five Million Dollars and No Cents ($125,000,000.00);

> b.     Loss of affection, consortium, comfort, protection and care;

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

25

PLAINTIFF'S THIRD AMENDED COMPLAINT

1       c.     Pain and suffering and mental anguish suffered by JAEGER

2            prior to his death;

3       d.     Mental anguish and emotional distress suffered by Plaintiff;

4       e.     Loss of quality of life;

5       f.     Funeral and burial expenses;

6       g.     Loss of service;

7       h.     Exemplary and punitive damages as well as reasonable

8            attorneys' fees authorized by law and costs of court;

9       i.     Prejudgment interest; and

10       j.     Post judgment interest.

11     67.    Plaintiff seeks un-liquidated damages in an amount that is within the

12 jurisdictional limits of the court.

13                **CONDITIONS PRECEDENT**

14     68.    Defendants have actual notice of JAEGER's death and injuries complained

15 of herein. Any conditions precedent have occurred, been performed, or have been waived.

16                **DEMAND FOR JURY**

17     69.    Plaintiff hereby makes a demand for a jury trial.

18

19                    **PRAYER**

20     Wherefore, Plaintiff prays that Defendants be cited to appear and answer herein

21 and, upon final trial hereof, that Plaintiff recovers from Defendants not less than One

22 Hundred Twenty-Five Million Dollars and No Cents ($125,000,000.00) in actual damages,

23 exemplary damages, pre-judgment and post-judgment interest, costs of court, attorneys'

24 fees all as authorized by law, and such other and further relief, both general and special,

25 at law and in equity, to which they may be justly entitled.

26

27

28

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

26

PLAINTIFF'S THIRD AMENDED COMPLAINT

1    DATED:  October 1, 2019               LAW OFFICES OF ROBERT A. BALL

2

3                                          By: /s/ Robert A. Ball
                                               ROBERT A. BALL, SBN (CA) 00761
4                                              JOHN M. DONNELLY, SBN (CA) 156965
                                               ADMITTED *PRO HAC VICE*
5                                              Attorneys for Plaintiffs KAREN DI PIAZZA,
                                               Individually and as Natural Mother to CORBIN
6                                              JAEGER and as
                                               Executor/Administrator/Representative of the
7                                              Estate of CORBIN JAEGER, DECEASED
                                               225 Broadway, Suite 2220
8                                              San Diego, California 92101
                                               Telephone (619) 234-3913; Fax (619) 234-4055
9                                              rball@robertballapc.com
                                               jdonnelly@robertballapc.com
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

27
_____
PLAINTIFF'S THIRD AMENDED COMPLAINT

1

2

DATED:  October 1, 2019            MCCLESKEY HARRIGER BRAZILL & GRAF LLP

3

4

By: /s/ Benjamin H. Davison, II
BENJAMIN H. DAVIDSON, II, SBN 05430590
MARY KATHLEEN DAVIDSON, SBN 24070919
Attorneys for Plaintiffs KAREN DI PIAZZA,
Individually and as Natural Mother to CORBIN
JAEGER and as
Executor/Administrator/Representative of the
Estate of CORBIN JAEGER, DECEASED
5010 University Avenue, 5th Floor
Lubbock, Texas 79413
Telephone (806) 796-7306; Fax (806) 796-7365
bdavidson@mhbg.com
kdavidson@mhbg.com

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
ROBERT A. BALL
225 BROADWAY, SUITE 2200
SAN DIEGO, CA 92101-5019
TELEPHONE 619-234-3913

28

PLAINTIFF'S THIRD AMENDED COMPLAINT

1

## <u>CERTIFICATE OF SERVICE</u>

2

3

4

        The undersign hereby certifies that he has served the above and forgoing document in accordance with applicable procedural rules, via ECF, on all counsel of record on this 1st day of October, 2019.

| | |
|---|---|
| 5<br>6<br>7<br>8<br>9<br>10 | DOUGLAS D. FLETCHER<br>Email: doug.fletcher@fletcherfarley.com<br>DAVID C. COLLEY<br>Email: david.colley@fletcherfarley.com<br>FLETCHER, FARLEY, SHIPMAN &<br>SALINAS, L.L.P<br>9201 N. Central Expressway, Suite 600<br>Dallas, Texas 75231<br>Phone: 214-987-9600<br>Fax: 214-987-9866 | CATHERINE L. HANNA<br>Email: channa@hannaplaut.com<br>LAUREN L. BURGESS<br>Email: lburgess@hannaplaut.com<br>HANNA & PLAUT, L.L.P<br>211 East Seventh Street, Suite 600<br>Austin, Texas 78701<br>Phone: 512- 472-7700<br>Fax: 512- 472-0205 |
| 11<br>12<br>13 | Mr. Robert B. Wagstaff<br>McMahon Surovik Suttle, P.C.<br>P.O. Box 3679<br>Abilene, Texas 79604<br>E-mail: rwagstaff@mcmahonlawtx.com | Mr. Mark W. McBrayer<br>Crenshaw, Dupree & Milam, L.L.P.<br>P.O. Box 64479<br>Lubbock, Texas 79464-4479<br>E-mail: mmcbrayer@cdmlaw.com |

14

15                                          */s/ Robert A. Ball*_____
                                         **ROBERT A. BALL**

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
ROBERT A. BALL
225 Broadway, suite 2200
San Diego, CA 92101-5019
Telephone 619-234-3913

29

PLAINTIFF'S THIRD AMENDED COMPLAINT